**STATE of Missouri, Respondent,**

v.

**Randall Dean RUSSELL, Appellant.**

No. 18699.

Missouri Court of Appeals,
Southern District,
Division One.

March 22, 1994.

Emmett D. Queener, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for respondent.

MONTGOMERY, Judge.

A jury found Randall Dean Russell (Defendant) guilty on two counts of sodomy, under § 566.060.[1] He appeals, claiming trial court error in allowing the jury to consider certain in-court and out-of-court testimonial evidence. We affirm in part, reverse in part and remand for new trial.

Defendant was living with a young mother and her three children[2] when the middle child (R.H.), a boy, told his mother that Defendant had been engaging in some sort of sexual activity with him. That was in the summer of 1991, when the boy was three years old. The mother did nothing about the complaints.

In August 1991, after allegations of sexual abuse were made to the Division of Family Services (DFS), Dr. Dean Rising examined R.H. and his older sister (A.H.) to determine if either showed signs of sexual abuse. Neither did. Six months later, in February 1992, Dr. Rising again examined R.H. and discovered that the boy had warts on his left hand and around his anus. Subsequently, Dr. Thomas Pearson, a urologist, determined that the warts around the child's anus were venereal warts.

On February 26, 1992, during a physical examination for an unrelated condition, Dr. Lehman Godwin noticed two types of lesions on Defendant's genital area. He identified one type as venereal (also called genital) warts.

Previously, on February 6, 1992, Marilyn Gibson, a Greene County deputy juvenile officer, conducted videotaped interviews with R.H. and A.H. During the interviews, both children incriminated Defendant. R.H. (who referred to a penis as a "wally") said Defendant had stuck his "wally" in the child's mouth. A.H. indicated Defendant had put his penis in her mouth and also had touched her vagina.

In March 1992, Dr. Rising conducted a follow-up examination of A.H. He found that, although the child's hymenal ring was

---

1. Statutory references are to RSMo 1986, unless otherwise indicated.

2. Defendant is the biological father of the youngest of these three children. He is accused of abusing the older two, to whom he is not related.

intact, her hymenal opening was large for a child her age (six). The enlargement, which Rising had not noted during his previous examination, indicated that someone may have touched or put something inside the child's vagina. Rising testified at trial: "The striking thing was—to me was that twice during the examination, [A.H.] said, 'Don't stick a finger in.'" When asked if anyone had stuck a finger inside her before, she said that Defendant had.

At trial, Defendant testified that he did not sexually abuse the two children. He also offered the testimony of two witnesses to rebut the allegation that he had venereal warts and had passed them to R.H. One witness was the police officer who had investigated Dr. Godwin's February 26, 1992, physical examination of Defendant. The other was Dr. Gene Schoonmaker, a physician who examined the warts on R.H.'s hand and anal area after Drs. Rising and Pearson had done so.

A jury found Defendant guilty on two counts of sodomy. The trial court sentenced him to two 30–year prison terms, to be served consecutively.

## POINT I. TESTIMONY OF DR. GODWIN

█ In his first point, Defendant attributes error to the trial court for refusing to suppress Dr. Godwin's testimony that, while examining Defendant, he discovered genital warts. Defendant claims that admission of this testimony violated the doctor-patient privilege as protected under § 491.060(5). In pertinent part, § 491.060 provides:

The following persons shall be incompetent to testify:

. . . .

(5) A physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon.

However, as Defendant himself points out, § 210.140 provides that in some instances privileged communications, even those between a physician and a patient, are not protected. That statute provides, in relevant part:

Any legally recognized privileged communication, except that between attorney and client, shall not apply to situations involving known or suspected child abuse or neglect and shall not constitute grounds for failure . . . to give or accept evidence in any judicial proceeding relating to child abuse or neglect.

Defendant argues that, given the circumstances of his relationship with Dr. Godwin, § 210.140 provides no basis for allowing Dr. Godwin to testify. We disagree.

In essence, Defendant argues that § 210.140 abrogates the physician-patient privilege only when the patient has sought medical or psychological help *specifically for abusive behavior*. Thus, according to Defendant's view, if he sought Dr. Godwin's help for reasons other than abusive behavior, then the privilege was not abrogated and Dr. Godwin should not have been allowed to testify. In support of this thesis, he cites three cases: *State v. Brydon*, 626 S.W.2d 443 (Mo.App. 1981); *State ex rel. D.M. v. Hoester*, 681 S.W.2d 449 (Mo. banc 1984); and *State v. Ermatinger*, 752 S.W.2d 344 (Mo.App.1988).

In *Hoester*, a civil action, the plaintiff attempted to introduce the psychiatric records of the defendant (her adoptive father), who allegedly sought treatment for his abusive behavior toward her. In *Brydon*, a criminal action, the defendant tried to suppress the testimony of a psychologist he had contacted for treatment following his sexual involvement with a 15–year–old foster child. In both cases, the reviewing courts held that § 210.140 abrogated the physician-patient privilege.

By contrast, in *Ermatinger* the reviewing court held that § 210.140 did not abrogate the physician-patient privilege. There, the victim, whose psychiatric records defendant attempted to introduce, had sought counseling because he feared he might be homosexual.

Based on these three cases, Defendant draws a distinction between seeking help for abusive behavior (which he says triggers

§ 210.140) and seeking help for other reasons (which he says does not trigger § 210.-140). On this basis, he argues that Dr. Godwin's testimony should have been suppressed, because Defendant's visit was "for a serious medical problem unrelated to the sexual abuse allegations." This argument has no merit.

In *Ermatinger*, the individual whose psychiatric records were at issue was the 16–year–old male *victim*, not the defendant. The defendant was charged with deviate sexual assault—a criminal charge in which the victim's consent is not an issue. Evidence of the victim's sexual orientation was irrelevant. Neither was it admissible to show the victim's character.

In contrast, Dr. Godwin's discovery of genital warts on Defendant about the same time Drs. Rising and Pearson discovered similar warts on R.H. is extremely relevant. Moreover, we find no indication whatever that the Missouri Legislature intended to limit the application of § 210.140 in the manner Defendant suggests. Because "[t]he physician-patient privilege has no constitutional underpinning and is statutory in origin," *State v. Ward*, 745 S.W.2d 666, 670 (Mo. banc 1988), legislative intent is of tantamount concern. Clearly, the legislature intended that § 210.-140 would abrogate the physician-patient privilege in "any judicial proceeding relating to child abuse." Defendant's first point is denied.

## POINT II. TESTIMONY OF DR. RISING

Defendant next contends the trial court erred in allowing Dr. Rising to testify about certain statements A.H. made during his examination of her in March 1992. Defendant argues that, because A.H.'s statements do not fall within a deeply rooted exception to the hearsay rule, the trial court, pursuant to § 491.075, should have held a hearing outside the presence of the jury to determine if the statements had sufficient indicia of reliability to warrant their admission. We agree.

3. § 491.075 provides that if the trial court finds, after a hearing conducted outside the jury's presence, that the time, content and circumstances of statements made by the child provide sufficient

Dr. Rising testified that, as he attempted to examine A.H.'s vaginal area, the child became subdued and frightened and twice told him, "Don't stick a finger in." A DFS social worker, who had escorted A.H. to Dr. Rising's office, was in the examination room at the time. "The social worker present asked [A.H.] if anybody had stuck in a finger," Rising testified, "and she said Daddy Randall had and that he was in jail."

Just before Dr. Rising gave this testimony, the assistant prosecuting attorney initiated a bench conference concerning the admissibility of this particular testimony. From her remarks, we presume the State's position was that, even though A.H.'s statements to Dr. Rising were hearsay, they were admissible on the basis of two, or maybe three, hearsay exceptions. The first exception involves statements made for the purpose of medical diagnosis or treatment. The second involves statements admissible pursuant to § 491.075.[3] The third involves excited utterances. The trial court admitted the testimony without specifying on which ground it based its decision.

In matters like this, involving the admission of evidence, this Court reviews for prejudice, not mere error, and we will reverse only if the error was so prejudicial that it deprived Defendant of a fair trial. *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). If evidence is competent under any theory, or for any purpose, the trial court cannot be convicted of reversible error for admitting it. *State v. Scown*, 312 S.W.2d 782, 789 (Mo.1958); *State v. Bohanon*, 747 S.W.2d 294, 299 (Mo.App.1988). However, improperly admitted evidence should not be declared harmless unless it can be said to be harmless without question and the record demonstrates the evidence did not influence the jury or the jury disregarded it. *State v. Grant*, 810 S.W.2d 591, 592 (Mo.App. 1991); *State v. Wright*, 582 S.W.2d 275, 277 (Mo. banc 1979).

"indicia of reliability," and if the child either testifies at the proceeding or is unavailable as a witness, such statements are admissible.

In its brief, the State contends that the trial court's ruling was correct because A.H. made her statements to Dr. Rising for the purpose of medical diagnosis or treatment. Clearly, any statements A.H. made to Dr. Rising about her physical symptoms or complaints were admissible as exceptions to the hearsay rule. *Breeding v. Dodson Trailer Repair, Inc.*, 679 S.W.2d 281, 284–85 (Mo. banc 1984). In addition, statements related to her medical history were admissible if reasonably pertinent to intelligent diagnosis and treatment. *Id.; State v. Jones*, 835 S.W.2d 376, 383 (Mo.App.1992). Such statements are trustworthy because a patient is deemed to know that proper diagnosis and treatment require her to provide accurate information. *Breeding* at 285.

However, not everything a patient says in a physician's presence falls within this hearsay exception. As the Eastern District Court of Appeals explained when it considered statements an automobile accident victim made to an attending physician, "The factual circumstances of the way in which the accident occurred would not generally be necessary for such diagnosis and treatment. The physician need not know which driver ran the stoplight." *Hughey v. Graham*, 604 S.W.2d 626, 630 n. 1. (Mo.App.1980).[4]

In the instant case, Dr. Rising, in order to treat or diagnose A.H., did not need to know *who* put a finger inside A.H.'s vagina. The fact that Dr. Rising did not ask "who" indicates he considered such information unnecessary for treatment or diagnosis. On the other hand, *why* the child did not want to be examined was reasonably necessary information. Dr. Rising had examined the child just a few weeks earlier. Perhaps the reason she did not want him to touch her was because that first examination had been painful. But the question "Why?" was not asked. Instead, the social worker (not Dr. Rising) asked whether "anybody had stuck in a finger." That social worker, who did not testify

at trial, presumably was gathering information aimed at identifying the person responsible for the alleged abuse—not information necessary for the child's diagnosis and treatment.

We also reject the State's unsupported assertion that A.H.'s statement falls within the excited utterance exception to the hearsay rule. As the Missouri Supreme Court recently reiterated, "[t]he test for excited utterance is whether it was 'made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event.'" *State v. Debler*, 856 S.W.2d 641, 648 (Mo. banc 1993) (quoting *State v. Van Orman*, 642 S.W.2d 636, 639 (Mo.1982)).

The *Debler* court used this test to appraise an incriminating remark a man made to his mother while the two were sitting in a sheriff's office some 15 hours after a murder had occurred. The man (a brother of the defendant in the case) blurted out a statement that implicated him and the defendant in the killing. A sheriff's deputy overheard the statement. Holding that the statement was not admissible, the court said:

> In the present case, while the passage of time—about 15 hours—and the change of location [from the murder site to the sheriff's office] is relevant, the controlling fact is that this utterance was not the product of the shock of the murder, but rather the emotion of talking to his mother. Therefore, the statement was not admissible as an excited utterance.

*Debler*, 856 S.W.2d at 648.

The same logic leads us to conclude that A.H.'s statement was not the product of the shock of Defendant's alleged abusive act. Rather, it was the product of feelings engendered by Dr. Rising's examination.[5] The statement was not admissible as an excited utterance.

---

4. *See also State v. Thrasher*, 654 S.W.2d 142, 144–45 (Mo.App.1983) (alleged rape victim's statements at hospital that she had been raped, was afraid, and was relieved to survive ordeal were not necessary or essential for diagnosis, observation, treatment or care and thus were improperly admitted at trial).

5. *See also State v. Jankiewicz*, 831 S.W.2d 195, 199 (Mo. banc 1992) (statement of child to her mother several weeks after father allegedly abused the child did not fall under excited utterance exception).

■ Neither can we determine that the statement was admissible pursuant to § 491.-075. As the Missouri Supreme Court has made clear, a child's out-of-court statement that does not fall within a firmly rooted hearsay exception (*e.g.*, excited utterance) is presumed inadmissible absent a showing that the circumstances surrounding the statement provide a sound basis for rebutting this presumption. *State v. Jankiewicz,* 831 S.W.2d 195, 198–99 (Mo. banc 1992). The proper forum for making such a showing is an in-chambers hearing, as required by § 491.075. *State v. Naucke,* 829 S.W.2d 445, 457 & n. 4 (Mo. banc 1992), *cert. denied,* — U.S. —, 113 S.Ct. 427, 121 L.Ed.2d 348 (1992). No such hearing was held in the instant case.

The decision in *Jankiewicz* was based on *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), a case that Defendant's counsel cited at trial and in the brief on appeal. In *Wright,* a young child was taken to a pediatrician for examination after suspicions arose that her father had sexually abused her. During the examination, the child made several incriminating statements about the father, some of which were in response to questions by the pediatrician,[6] some of which were spontaneous.[7] The Supreme Court concluded that none of the statements should have been admitted at trial. *Id.* at 825, 110 S.Ct. at 3152–53.

The *Wright* court emphasized that admission of an out-of-court statement against a defendant requires a showing that the statement is reliable. *Id.* at 814, 110 S.Ct. at 3146. Such a showing can occur in one of two ways. First, reliability " 'can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.' " *Id.* (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). " 'In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' " *Wright,* 497 U.S. at 814, 110 S.Ct. at 3146 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539).

■ A statutorily created exception to the hearsay rule, such as § 491.075 (and the statute at issue in *Wright* ), is not a firmly rooted (traditional) exception. *Naucke,* 829 S.W.2d at 457. Thus, because A.H.'s statement was inadmissible under the medical diagnosis or excited utterance exceptions (which are firmly rooted), an in camera hearing and finding by the trial court was necessary to determine if the statement possessed particularized guarantees of trustworthiness. *Id.* at 457 & n. 4.[8]

In *Wright,* the court determined that none of the child's incriminating statements fell within a firmly rooted hearsay exception. *Id.* 497 U.S. at 825–27, 110 S.Ct. at 3152–53. The statements were "not made under circumstances of reliability comparable to those required, for example, for the admission of excited utterances or statements made for purposes of medical diagnosis or treatment." *Id.* at 827, 110 S.Ct. at 3152. In addition, because the State of Idaho failed to show that the statements possessed sufficient particularized guarantees of trustworthiness under the Constitution's Confrontation Clause, the statements were not admissible pursuant to Idaho's statutorily created hearsay exception. *Id.* at 827, 110 S.Ct. at 3153.

Based on the record before us, we do not rule on the question of whether A.H.'s statement in Dr. Rising's presence meets the indicia of reliability requirements of *Roberts* and § 491.075. That issue is for a trial court to explore in a hearing outside the presence of the jury.[9]

---

6. The crucial questions in the interchange between the physician and the child were, "Does daddy touch you with his pee-pee?" and "Do you touch his pee-pee?" The child answered affirmatively to the first question, but did not answer the second.

7. The child reportedly said, without prompting, that the father engaged in sexual activity with the child's older sister.

8. In note 4, the *Naucke* court refers to *Wright* as a case "which discusses in detail the type of in-chambers hearing and finding by the trial court that is necessary to meet confrontation requirements for the out-of-court statements of a child sexual abuse victim admitted under an Idaho statute similar to § 491.075, RSMo."

9. Relevant factors to be considered include (but are not limited to) "spontaneity and consistent repetition," "use of terminology unexpected of a child of similar age," "lack of motive to fabri-

This conclusion is not changed by the holding in *Naucke, supra.* As the State points out, in *Naucke* the Missouri Supreme Court upheld the admission of hearsay statements by a child abuse victim to an examining physician, even though the trial court failed to hold a § 491.075 hearing. However, the reason the Court dispensed with the hearing requirement was because the child's statements clearly fell within the medical treatment and history exception. The child's statements pertained only to how the child had been abused (which was relevant to treatment), not who was responsible. Had the statements fallen outside this deeply rooted hearsay exception, a hearing would have been required. *Id.,* 829 S.W.2d at 457 & n. 4.

Furthermore, this is not a case like *State v. Culkin,* 791 S.W.2d 803 (Mo.App.1990). There, the defendant (an uncle of the child victim) alleged trial court error for admitting into evidence the child's out-of-court statement to a physician that her uncle had penetrated her vagina with his finger and had attempted to do so with his penis. "We cannot see that defendant suffered any prejudice," the court said. *Id.* at 810. "Dr. Rosenbloom testified regarding an unnamed 'uncle' and defendant's defense was that another family member was responsible for the crimes." *Id.* By contrast, A.H.'s statement was not ambiguous and did not in any way bolster Defendant's defense.

We cannot say without question that the jury here disregarded Dr. Rising's testimony on A.H.'s statement, thus making the error harmless. A.H.'s videotaped interview and in-court testimony, by themselves, may not have convinced a jury that Defendant had abused her. While testifying in court, the child denied that any abuse had occurred.

For trial court error, the judgment and sentence on Count I, involving A.H., must be reversed and the cause remanded for new trial.

## POINT III. TESTIMONY OF MARILYN GIBSON

■■■ Defendant's third point relied on states the following:

The trial court abused its discretion in allowing Marilyn Gibson to testify over objection regarding the statements of [A.H.] and [R.H.], because those rulings violated Appellant's right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Missouri Constitution, in that there were insufficient indicia of reliability for the court to admit the statements into evidence.

The focus of this point seems to be the testimony of Marilyn Gibson during Defendant's trial. Surprisingly, the argument that follows addresses only the admissibility of the videotaped interviews Marilyn Gibson conducted with the two children. The argument does not correspond to the point relied on.

Appellate courts review only for matters raised in the points relied on. *State v. Hill,* 812 S.W.2d 204, 208 (Mo.App.1991). Because Defendant's argument fails altogether to explain why Marilyn Gibson's testimony should have been excluded, we do not consider that issue.

Even if Defendant's argument had matched his point, however, the outcome would be the same. At trial, Marilyn Gibson never recited any statements the children made to her. She merely described the circumstances under which she conducted the videotaped interviews, as required by § 492.-304.[10] Furthermore, counsel for Defendant objected to none of Gibson's testimony at trial. He objected only to the introduction of the tapes. Defendant's third point is without merit.

cate," and "mental state of the declarant." *Wright,* 497 U.S. at 821–822, 110 S.Ct. at 3150; *Jankiewicz,* 831 S.W.2d at 198–99.

10. See the discussion of this statute under Point IV, *infra.*

## POINT IV. ADMISSIBILITY OF VIDEOTAPED INTERVIEW

In Point IV,[11] Defendant alleges the trial court erred by admitting into evidence the videotaped interview Marilyn Gibson conducted with R.H.[12] He claims that R.H.'s statements on the tapes were made in response to questioning that was "calculated to lead R.H. to make a particular statement or to act in a particular way." His claim lacks merit.

During a pre-trial evidentiary hearing, the trial court ruled that the videotaped interviews with the children were admissible at trial pursuant to either of two statutes, § 491.075 or § 492.304. Defendant focuses primarily on the second statute, but argues that the videotapes were admissible under neither.

In pertinent part, § 492.304 provides as follows:

1. In addition to the admissibility of a statement under the provisions of section 492.303, the visual and aural recording of a verbal or nonverbal statement of a child when under the age of twelve who is alleged to be a victim of an offense under the provisions of chapter 565, 566 or 568, RSMo, is admissible into evidence if:

. . . .

(4) The statement was not made in response to questioning calculated to lead the child to make a particular statement or to act in a particular way[.]

Defendant contends that Marilyn Gibson's conduct as she interviewed R.H. violated provision (4) above.

At the outset, we note that when videotaping an interview with a child, an interviewer "may not suggest any conduct or phrase a question so as to suggest an answer." *State v. Fraction*, 782 S.W.2d 764, 767 (Mo.App.

1989). In other words, § 492.304 "precludes leading questions which essentially put words in the child's mouth." *State v. Moesch*, 738 S.W.2d 585, 587 (Mo.App.1987). On the other hand, an "interviewer may direct the child to areas of inquiry." *Fraction* at 767.

From Gibson's interview with R.H., Defendant focuses on two topics of discussion between the child and interviewer. The first concerned whether Defendant put his penis in the child's mouth. The second concerned whether the child witnessed Defendant engage in some sort of sexual activity with the boy's sister, A.H.

■ At one point during the interview,[13] Gibson asked R.H. whether he liked Randall. The child said no. When Gibson asked him why, the child said, " 'Cause he hurts my mouth," and demonstrated how Defendant had squeezed his mouth. The following dialogue then ensued:

Gibson: "What else does he do?"

R.H.: "He sticks—I stick up his wally in his mouth."

Gibson: "He sticks up his wally in your mouth?"

R.H.: "No. I sticked up his wally in his mouth."

Gibson: "What happens when the wally is in the mouth?"

R.H.: "I hurt him and I slapped him on the mouth and he got dead."

Gibson: "Where does he put his wally on you?"

R.H.: "He puts it in my mouth."

Gibson: "Does he put it anyplace else?"

At this, the child pointed to his own teeth.

Gibson then showed the child two anatomically correct dolls, a man and a boy. The

11. As with Point III, Defendant goes astray when addressing Point IV in the argument section of his brief. The argument section includes two distinct Point IVs, each with a different argument. The first reiterates the error alleged in Point III (that the court should not have allowed Marilyn Gibson to testify about statements the children made). Having already dealt with that issue, *supra*, we decline to do so again. Thankfully, the second Point IV (which we do address) is the same in both the argument and the points relied on sections of the brief and includes an argument that corresponds to the point.

12. In this point (the second distinct Point IV), Defendant also claims the videotape of A.H.'s interview was erroneously admitted. We decline to discuss that issue because Defendant can properly raise it upon retrial of the count involving A.H. and upon any subsequent appeal.

13. This interview occurred just prior to R.H.'s fourth birthday.

child immediately identified one as Randall, and when Gibson asked if the other was R.H., he said, "Yeah." When Gibson asked him to demonstrate where Randall had put his penis the child straightaway pointed to his own mouth, not the doll's.

After watching the videotape of this somewhat confusing conversation, we do not detect that Gibson was trying to manipulate the child's responses. As Gibson testified at trial, in her experience with small children, they commonly confuse their pronouns. Early in this exchange Gibson may have thought that was the case, especially since just before this R.H. had confused his pronouns. When Gibson asked R.H. what Defendant's relationship was to the child's mother, he said, "He's her girlfriend." Obviously, he meant either that she was his girlfriend or he was her boyfriend.

Confusion about pronouns may not have been all that was at work in the dialogue about the "wally," *supra.* The child also said, "I sticked up his wally in his mouth" and "I hurt him and I slapped him on the mouth and he got dead." Whatever the child meant by these statements,[14] we do not see Gibson's follow-up questions as inappropriate. The child had broached the issue of some kind of oral sexual activity involving his own mouth—which he said Defendant had hurt—and Defendant's penis. Gibson's questions and statements were reasonable attempts to focus and clarify what the child was talking about. This was no easy task in light of the fact that the child apparently suffers from attention deficit disorder.[15]

Later in the interview, R.H. again indicated that Defendant had put his penis in the child's mouth and had put it on or against the child's teeth, buttocks and penis. Again, Gibson's questions and statements related to these disclosures appear to be attempts to narrow the field of inquiry or to clarify the child's answers. We see no evidence of manipulation or trying to put words in the child's mouth. As she indicated during her trial testimony, when interviewing children she must often ask essentially the same question in different ways. Children, she said, tend to interpret questions narrowly and literally and often miss the meaning of a broadly phrased, general question.

A few times during the interview, Gibson did ask "yes or no" questions about additional activities Defendant may have engaged in. In the context of the entire interview, however, these were insignificant. In each case, the child simply answered no and moved on. Throughout the interview, he held to his allegation that Defendant had placed his penis in the child's mouth.

■ Defendant also argues that Gibson led R.H. to say that he had seen Defendant put his penis in his sister's mouth. This is not the case. Early in the interview, after R.H. indicated that Defendant had put his penis in the child's mouth, Gibson asked where else Defendant had put his penis on the child's body. R.H. replied, "In (or possibly "On") my sister."

Gibson then asked where Defendant put his penis in R.H.'s sister. "He don't put— just in my mom," he said. "He don't put it in your Mom? Just in your sister?" Gibson asked. "No," R.H. said. He then showed her two dolls (an adult female and a child female), who he said were A.H. and the children's mother. "What does he do with his wally with them?" Gibson asked. "He don't do nothing," he answered. Gibson then moved on to other matters.

Later, however, Gibson again brought up the topic of whether R.H. had witnessed any sexual activity between Defendant and A.H.

Gibson: "I know what I was going to ask you. Tell me what you saw Randall do with [A.H.], with your sister."

R.H.: "Nothing."

Gibson: "How do you know he did something to her?"

R.H.: "He didn't."

---

14. On re-direct examination at trial, Gibson indicated that, in her experience, it is common for younger abused children to say things they would like to happen to their abuser, such as being hurt or killed.

15. Gibson testified at the pre-trial hearing that R.H. was hyperactive and had been diagnosed with attention deficiency disorder. The boy's mother testified at trial that the child was hyperactive.

Gibson: "I thought you told your Mom he did—you know, your new Mom (a reference to the child's foster parent, whom he called his "new Mom"). I thought you told your new Mom that he did. Did you? What did you tell your new Mom that Randall did to your sister?"

R.H.: "My sister, he done it ... he done stickin', stickin' his wally in her mouth."

Gibson then asked the child several questions about where he had been when he saw this. During this questioning, the child indicated he had witnessed some kind of sexual activity between Defendant and A.H.

Defendant claims that, because R.H. had earlier denied that any such activity occurred, Gibson's follow-up questions were unwarranted. However, earlier still, R.H. had spontaneously told Gibson that Defendant put his penis in or on A.H. Gibson had information that R.H. had made similar comments to his foster mother. So her attempts to clarify the boy's statements were appropriate. Furthermore, by asking whether Defendant "did something" to or with A.H., she did not dictate the child's response. She did not overstep the bounds of § 492.304.1(4).

In summary, we hold that the videotaped interview with R.H. was properly admitted at trial, as was the testimony of Dr. Lehman Godwin. On the other hand, Dr. Dean Rising's testimony that A.H. said Defendant put his finger in her vagina was improperly admitted, absent a § 491.075 hearing outside the jury's presence. We therefore affirm the jury's verdict as to the count involving sexual abuse of R.H.[16] As to Count I, involving alleged abuse of A.H., the judgment is reversed and the cause remanded for new trial.

PARRISH, C.J., and SHRUM, J., concur.

---

**16.** Dr. Rising's testimony regarding A.H.'s out-of-court statement had no bearing on this count. The videotaped and in-court testimony of R.H., coupled with the medical evidence, provided overwhelming proof of abuse.