**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Jimmie Lee TALLEY, Defendant–
Appellant.**

No. 28624.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 1, 2008.

Jack N. Brill II, Joplin, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Roger W. Johnson, Assistant Attorney General, of Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

Jimmie L. Talley ("Defendant") was convicted after a jury trial of first-degree statutory sodomy pursuant to section 566.062.[1] Defendant alleges that the trial court erred by: 1) overruling both Defendant's motion *in limine* and subsequent objection at trial to the admission of his medical records; 2) overruling Defendant's objection to certain questions the trial court asked the *venire;* 3) permitting the State to file a Second Amended Information at the close of the State's case-in-chief; 4) providing to the jury for use during its deliberations an authenticated copy of a prior conviction Defendant had for child abuse that was received into evidence pre-trial to determine whether Defendant qualified as a "prior offender" for sentencing purposes; 5) overruling Defendant's objections to two comments made by the State during its closing argument; and 6) overruling Defendant's motions for judgment of acquittal because there was insufficient evidence to support the jury's verdict. For the reasons outlined below, we affirm the judgment.

## I. Factual and Procedural Background

Viewed in the light most favorable to the verdict, *State v. Woodmansee,* 203 S.W.3d 287, 289 (Mo.App. S.D.2006), the pertinent facts are as follows:

---

1. All statutory references are to RSMo (2000), unless otherwise specified.

Defendant was the step-father of C.H., a female child born July 6, 1988 ("Victim"). Victim was thirteen years old and was living with Defendant, her mother, and two siblings at the time of this offense. Defendant was a strict disciplinarian and required all of the children in the home to obey him. Before Victim reached her thirteenth birthday, Defendant paid little attention to her. At that point, however, Defendant began to take an increased interest in Victim and began spending more time with her. After one of Victim's basketball games, Defendant had Victim weigh herself. Defendant told Victim that she was fat and that no one would love her unless she lost some weight. Seemingly trying to help her, Defendant began to have Victim exercise regularly with him. Defendant, who drove a truck for a living, also began taking Victim along on his routes more often than he took the other children.

In April or May of 2002, Victim, Defendant, and Victim's mother were going to go out to eat. Victim was alone in the living room with Defendant while Victim's mother was getting ready in an upstairs bedroom. Defendant began to "wrestle"[2] with Victim and eventually pulled down her shorts, pushed her underwear to the side, and put his mouth on her vagina. Victim remembered the contact as lasting approximately two minutes and ending when they heard her mother moving around upstairs and closing the door. When Victim later asked Defendant about what had happened, he told her not to worry about it; he was just really stressed out with marital problems and Victim was helping to keep peace in the house. Defendant told Victim that he was also helping her out as she was "having all these

hormones" and it was better that he do something about it instead of a boy "who could knock [her] up."

After this particular incident, Defendant continued to encourage Victim to exercise and get involved in sports, but he also began to take her out to dinner and buy her things she wanted from the store. Victim continued to ride with Defendant in his truck and often accompanied him on delivery trips to an underground storage facility in Carthage, Missouri. While waiting for his truck to be loaded or unloaded, Defendant would go into the sleeper section of the truck and tell Victim to join him-that he had something to show her. Once in the sleeping area, Victim would be forced to take her pants off and lie on the bed while Defendant put his mouth on her vagina. Defendant would also put his penis in Victim's mouth. Additionally, Defendant would lie on Victim while rubbing against her and pushing his penis against her vagina. Defendant once tried to penetrate Victim's vagina, but she told him to stop because it hurt. Although Defendant did stop at that time, he told Victim that he had "taken ... virginity" before and that it did not hurt that much. He went on to tell Victim that if she wanted to have sexual intercourse with him, all she had to do was tell him.

Victim felt as though these sexual encounters with Defendant would last for several hours at a time and took place on most of the trips she made with Defendant to the underground facility in Carthage during the time period that fell between April and May of 2002 and the start of school in August of that same year.

In the fall of 2002, Victim began dating C.M. ("Boyfriend"), a boy she met at

---

**2.** Victim described this as a type of play that she and the other children would engage in

with Defendant from time to time.

school. On one occasion after Victim and Boyfriend started dating, Defendant and Victim's mother saw them kissing on the way home from school. Defendant "freaked out" at this sight and began screaming at Victim that she was a "slut." After Defendant and Victim's mother divorced in October of 2002, Victim continued to see Boyfriend and they began engaging in sexual activity, including sexual intercourse, later that year.

The first time Victim told anyone about her sexual encounters with Defendant was when she told Boyfriend about them in April of 2003. Boyfriend urged Victim to tell her mother what had happened, and Victim did so a month later when school let out. When Victim told her mother about her sexual activities with Defendant, Victim's mother contacted the police who then arranged for Victim to be taken to the Child Center for a forensic interview and medical examination. That medical examination diagnosed victim as having genital warts.

A detective with the Webb City Police Department interviewed Defendant, who denied ever having any type of sexual contact with Victim. Defendant also initially denied ever having been diagnosed with or treated for genital warts. Defendant eventually admitted that he had had genital warts at one point in time, but had been successfully treated and no longer had them. The detective told Defendant there was no cure for genital warts and that Defendant would always carry the virus even if he had no apparent outbreaks. Defendant stated that wasn't true and that he no longer had genital warts. During this first interview with the detective, Defendant also admitted that his penis had an abnormally large glans.

Prior to the start of trial, Defendant filed several motions *in limine*. One of those motions challenged the anticipated admission of certain medical records of Defendant that would indicate he had been diagnosed as having Condyloma, a virus that causes genital warts. The trial court overruled the motion *in limine* and also allowed the records to be admitted into evidence at trial over Defendant's objection.

Also prior to the start of trial, the State asked the trial court to find, under section 558.016, that Defendant qualified as a prior offender because of a 1997 third-degree felony child abuse conviction he had received in the state of Utah. The trial court, at that time, received as evidence State's Exhibit 7—an authenticated record of the Utah conviction—and found Defendant to be a prior offender.

During the State's portion of *voir dire*, one of the *venire* disclosed that she had three grandchildren who were about the same age as Victim and had probably been classmates of Victim at one time or another. After making this observation, the panelist said, "I just, you know, I don't know that I can be all that fair." When counsel for the State questioned her further, the panelist went on to say that she would "do [her] best ... [b]ut if there was any doubt, I would probably side for the child."

After the State had finished its portion of *voir dire*, and before Defendant had an opportunity to question the panel, the trial court asked its own questions of this particular *venireperson*[3] and other panel members the trial court believed had given equivocal answers when questioned about their ability to be fair and impartial. De-

---

**3.** The trial court questioned several panelists, but we provide more detail here as Defendant's point relied on only challenges the con-

duct as it relates to this particular *venireperson*.

fendant's counsel asked to approach the bench and objected to this procedure by saying: "for the record, Your Honor, I would just like to respectfully object to the Court's rehabilitating of a witness in that manner. But again, I defer to the Court's judgment in that matter, but for the record, I just wanted to note that as far as the Court rehabilitating a witness, any more specific questions, I would object. All right." Shortly thereafter, the trial court granted Defendant's request for a continuing objection to the court's direct questioning of the *venire* on the grounds that the court was improperly rehabilitating and intimidating them.

After *voir dire* was completed, the trial court denied Defendant's request that the *venireperson* quoted above be stricken for cause. Defendant thereafter removed her by using one of his peremptory strikes.[4]

Victim was the State's chief witness and testified about her sexual encounters with Defendant in accordance with the factual recitation set forth above. She also testified that Defendant's was the first aroused penis she had ever seen. When describing Defendant's penis, she said it had an abnormally large glans, but she did not think this unusual until she later became intimate with Boyfriend.

Boyfriend testified during direct examination that he did not have, and had never had, any genital warts. On cross-examination, Boyfriend did admit, however, that he had never been tested to see if he had the virus that causes them.

At the close of the State's case-in-chief, Defendant moved for a judgment of acquittal, based primarily on the fact that the dates alleged in both the original and amended informations filed by the State—

August 1, 2002, through August 31, 2002—fell *after* Victim's fourteenth birthday, and the charge of first-degree statutory sodomy requires the victim to be under the age of fourteen at the time of the alleged sexual contact. The State countered that Victim testified to being less than fourteen years of age when at least some of the sexual abuse occurred, and that there had been no testimony up to that point as to Victim's actual date of birth. The trial court denied Defendant's motion.

After Defendant's motion for judgment of acquittal was denied, the State requested leave to file a Second Amended Information that changed the dates of the alleged sexual conduct to April 1, 2002, through July 5, 2002; the later date was alleged by the State to be the day before Victim's fourteenth birthday. The trial court permitted the Second Amended Information to be filed over Defendant's objection. Defendant entered a plea of not guilty to the Second Amended Information without reasserting any claim that he was entitled to a judgment of acquittal on the newly amended charge.

The trial then continued, and Defendant testified in his own defense. Defendant's testimony amounted to a confirmation of everything Victim had related except for the sexual encounters themselves. Defendant admitted taking Victim—as well as the other children—with him on delivery trips, but denied that anything inappropriate ever occurred during those trips. Defendant further stated that while his truck did have a secluded sleeping area in the cab that could not be seen from outside the truck, the truck also had an air-suspension system which caused the cab of the truck

---

4. If we discern Defendant's argument correctly, his complaint is not limited to the alleged bias of this particular panelist (an issue that would have been rendered moot by his striking her from the jury—*see State v. Storey*, 40 S.W.3d 898, 904 (Mo. banc 2001)), but that *all* of the panelists were improperly influenced by the trial court's questions.

to visibly move if anyone so much as moved his or her leg in time to music. Defendant admitted on cross-examination, however, that if someone had observed the truck moving in this manner they would not have thought anything unusual was taking place inside because this type of motion was so common.

Defendant testified that he drove to the underground Carthage facility on only two or three occasions between April and August of 2002, and there would not have been enough time on any of those occasions for anything inappropriate to have occurred. Defendant also said that he usually filled out paperwork while he was waiting for his truck to be loaded or unloaded, and a security guard would roam around the trucks every ten to fifteen minutes.

Defendant denied favoring Victim with any special treatment and denied being upset with Victim when he saw her kissing her boyfriend. Defendant admitted to being upset with Victim on that occasion, but said he was upset with her because she had come home two hours late and he had had to go out looking for her. Defendant stated that between the months of April and August of that year, he only gave Victim one gift; a present for her fourteenth birthday.

Defendant admitted that he "wrestled" with all three of his stepchildren, but stated that the children had always remained fully clothed. Defendant did recall the particular wrestling incident Victim had testified about, but denied that anything inappropriate had occurred and stated that Victim's mother would have been able to see into the living room from the landing just outside her upstairs bedroom. Defen-

dant averred that there was no way Victim could have been up and dressed before her mother came downstairs if the incident had occurred as Victim had described it.

Defendant denied ever removing Victim's clothes or putting his mouth on her vagina or breasts. Defendant also denied ever putting his penis in Victim's mouth, vagina, or anus. Defendant also denied that there was anything abnormal about the size of the glans on his penis and said he never told the detective that there was. Defendant acknowledged that he had been treated for genital warts in both 1998 and 2001, but said he thought they were plantar warts at the time. Defendant acknowledged that he initially believed that once the wart was gone he no longer had a sexually transmitted disease, but admitted he had subsequently been examined and determined to be a carrier of the virus that causes genital warts.[5] Defendant presented no other evidence.

The State did not present any rebuttal evidence, and Defendant moved for a judgment of acquittal at the close of all evidence. This motion was also denied by the trial court and the case was submitted to the jury. The facts related to the trial court's jury instructions and the State's closing arguments are set forth below in connection with our analysis of Defendant's challenges to them.

During its deliberations, the jury sent the judge a note that simply said "all exhibits." The trial court interpreted this to be a request by the jury that they be given all of the exhibits. In addition to providing the jury with all of the exhibits that had been received into evidence in its presence, the trial court also sent the jury

---

5. This admission was also consistent with the trial testimony of the nurse practitioner who had examined Victim at the Child Center. She testified that genital warts are called Con-

dyloma and that the virus that causes them remains in a person's system even after the warts are removed.

State's Exhibit 7—the authenticated copy of Defendant's prior Utah conviction for child abuse—over Defendant's objection.

Ultimately, Defendant was convicted of first-degree statutory sodomy pursuant to section 566.062. The trial court sentenced Defendant to seventeen years' incarceration. Following his conviction and sentencing, Defendant filed a motion for a judgment of acquittal, or in the alternative, for a new trial, which was denied by the trial court. This appeal followed.

## II. Discussion

Defendant presents six points relied on and we will address them in the order presented.

### Issue One: Admission of Defendant's Medical Records

■ Defendant's first point challenges the trial court's admission of his medical records which indicated that Defendant was a carrier of the virus that causes genital warts. Specifically, Defendant argues that the admission of these records violated the physician-patient privilege, his right to confront the witnesses against him, and the requirements of section 210.140, RSMo Cum.Supp. 2001.

It is worth noting that Defendant has not fully complied with the applicable Court Rules governing the content of his brief. Rule 30.06(c)[6] dictates that the "statement of facts, points relied on, argument and appendix shall be prepared as provided in Rule 84.04." Rule 84.04(d) mandates that each point relied on "identify the trial court ruling or action that the Defendant challenges." Rule 84.04(d)(1)(A). Although Defendant's argument section mentions both the trial court's denial of his motion *in limine* and the overruling of his eventual objection at trial to the admission of the medical records, Defendant's point relied on mentions only the trial court's ruling on his motion *in limine*.

■ A trial court's denial of a motion *in limine* is an interlocutory ruling only; its denial is not subject to appeal. *State v. Day*, 87 S.W.3d 51, 52 (Mo.App. S.D.2002). Moreover, "ordinarily, a point relied on that refers only to a ruling on [ ] a [pretrial] motion is fatally defective." *State v. Cardona–Rivera*, 975 S.W.2d 200, 203 (Mo. App. S.D.1998) (point relied on challenged only the trial court's pre-trial ruling on a motion to suppress). *See also State v. Wolf*, 91 S.W.3d 636, 642 (Mo.App. W.D. 2002); *State v. Patino*, 12 S.W.3d 733, 740 (Mo.App. S.D.1999); and *State v. Rodgers*, 899 S.W.2d 909, 911 (Mo.App. S.D.1995).

Defendant's argument section also lacks the requisite discussion of the applicable standard of review. In addition to following substantially the content of the point relied on, "[t]he argument shall also include a concise statement of the applicable standard of review for each claim of error." Rule 84.04(e). "The requirements of Rule 84.04 are both mandatory and essential in that they enable the appellate courts to function smoothly and effectively." *State v. Hill*, 247 S.W.3d 34, 44 (Mo. App. E.D.2008) (citing *State v. Jones*, 786 S.W.2d 926, 927 (Mo.App. W.D.1990)). Failure to abide by the requirements of Rule 84.04 leaves nothing for this Court to review. *State v. Franke*, 234 S.W.3d 484, 485–86 (Mo.App. E.D.2007).

■ Finally, even if this Court were to overlook the deficiencies in Defendant's brief and review the trial court's decision to admit Defendant's medical records for plain error pursuant to Rule 30.20, Defendant's argument would still fail. The phy-

---

**6.** All rule references are to Missouri Court Rules (2007), unless otherwise specified.

sician-patient privilege Defendant so heavily relies on is purely statutory; it "has no constitutional underpinning." *State v. Ward,* 745 S.W.2d 666, 670 (Mo. banc 1988). Section 491.060(5) does provide for confidentiality between a doctor and patient, but this Court, in *State v. Russell,* 872 S.W.2d 866, 868 (Mo.App. S.D.1994), has already established that section 210.140 abrogates the physician-patient privilege in cases of alleged child abuse. *Id.* at 869.

■■■ Defendant also contends in his point relied on that the trial court's decision violated his right to confront the witnesses against him but makes no mention of any such claim in his argument section. It is neither the responsibility nor the function of this Court to peruse the record and create an argument for Defendant when he has failed to make one. *See State v. Neher,* 213 S.W.3d 44, 49 (Mo. banc 2007) (holding that a claim raised in a point relied on but not discussed in argument is considered abandoned); *see also State v. Patrick,* 545 S.W.2d 686, 688 (Mo. App. E.D.1976). Defendant's first point is dismissed.[7]

### Issue Two: Trial Court's Questioning of the *Venire*

■■■ Defendant's second point contends that the trial court erred by personally questioning various members of the *venire* over Defendant's objection. In particular, Defendant argues he was denied a fair and impartial jury because the trial court improperly rehabilitated potential jurors who had previously given equivocal answers as to their ability to be fair when questioned

by the State, and the questioned panelists' responses—given in the presence of the entire *venire*—reinforced the trial court's desired responses and served to intimidate those who ultimately became jurors into finding against Defendant.

Although Defendant only requests plain error review in his brief, he did object to the trial court's questioning of the panel at trial and also presented the issue in his motion for new trial.

■■■ It is well established that a trial court has broad discretion in conducting and controlling *voir dire. State v. Nicklasson,* 967 S.W.2d 596, 608 (Mo. banc 1998); *State v. Bannister,* 680 S.W.2d 141, 145 (Mo. banc 1984). This Court must defer to the trial court's rulings and will overturn them only when it determines that the trial court abused its considerable discretion. *Id.* Such an abuse of discretion occurs only when the ruling of the trial court is "so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." *State v. Partridge,* 122 S.W.3d 606, 609 (Mo.App. E.D.2003).

■■■ There is no question that a trial judge may ask his or her own questions during the course of *voir dire. See, e.g., State v. Mudgett,* 531 S.W.2d 275, 279 (Mo. banc 1975) (allowing the trial court to ask questions prior to both the state and the defendant) and *State v. Richards,* 467 S.W.2d 33, 38 (Mo. banc 1971) (holding that it is within the trial court's discretion to question the *venire* in addition to each party's questioning). Furthermore, it is

---

**7.** As in his claim that his medical records were shielded by the doctor-patient privilege, Defendant's claim that their admission violated his confrontation rights would also have failed any plain error review. Because the medical records in question were not created in preparation for litigation, they are for that

reason not considered "testimonial" in nature and fall outside the types of evidence prohibited by both *Crawford v. Washington,* 541 U.S. 36, 56, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Davis v. Washington,* 547 U.S. 813, 821–22, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

within the discretion of the trial court to ask specific questions of the *venire* in order to clarify equivocal answers previously given by particular panelists. *State v. Taylor*, 643 S.W.2d 14, 16–17 (Mo.App. E.D.1982). There is no requirement that the trial court conduct any such questioning individually or out of the hearing of the other potential jurors. *State v. Chambers*, 891 S.W.2d 93, 102 (Mo. banc 1994). The burden is on Defendant to demonstrate that comments made during *voir dire* resulted in a biased jury. *State v. Reed*, 789 S.W.2d 140, 141 (Mo.App. S.D.1990).

In the case at hand, Defendant fails to meet that burden. Defendant proffers no actual evidence of prejudice within the panel—let alone within the jury—he merely makes conclusory statements without citing any evidence in support of them. Defendant asserts that the trial court's questioning served not the admirable purpose of clarifying equivocal responses, but as a tool to intimidate the other panelists and "reinforce the response sought by the [c]ourt." Even if we were to overlook the trial court's own explanation [8] of the purpose of its questions, the answers given by various panel members when later questioned by Defendant's counsel indicate that no such intimidation had occurred. After the trial court had finished its questioning of the *venire*, there were numerous instances in which panel members continued to express concerns about their ability to be impartial. One of the panelists whose questioning by the trial court had been particularly extensive showed no indication of having been intimidated into giving responses she thought the trial court was looking for and continued to feel free to give equivocal responses. Defendant also

fails to cite to any case law that would support his contention that any questioning of potential jurors by the trial court should have occurred, if at all, only outside the presence of the other panel members. Defendant's second point is denied.

### Issue Three: Mid-trial Amendment of Information

■ Defendant's third point contests the trial court's decision to allow the State to file a Second Amended Information at the close of its case-in-chief that changed the dates within which the offense was alleged to have occurred. In so doing, Defendant argues the trial court deprived him of his due process rights because he was forced to defend a charge of which he was previously unaware.

■ When properly preserved and presented, we review a challenge to a trial court's decision to allow the State to file an amended information for an abuse of discretion. *State v. Boone Retirement Center, Inc.*, 26 S.W.3d 265, 268 (Mo.App. W.D.2000). "An amendment to the date or time of the commission of an offense which is not essential to the crime charged lies within the discretion of the trial court." *State v. Sloan*, 912 S.W.2d 592, 599 (Mo. App. E.D.1995) (citing *State v. Simmons*, 825 S.W.2d 361, 365 (Mo.App. E.D.1992)). Once again, Defendant has failed to include a discussion of the proper standard of review as required by Rule 84.04(e).

■ The applicable rule of criminal procedure governing the amendment of informations states that "[a]ny information may be amended ... at any time before verdict or finding if: (a) no additional or

---

**8.** When Defendant objected to the trial court's questions, the judge said: "You know, I just want to be clear over some of these people by whose answers I am not clear as to their position as to whether they could fairly hear the evidence and follow the law and I believe that's the real issue. There are lots and lots and lots of people in this courtroom who don't want to hear any of these issues including me."

different offense is charged, and (b) a defendant's substantial rights are not thereby prejudiced." Rule 23.08. "Prejudice," as used in Rule 23.08, is determined by examining "(1) whether a defense to the charge as originally made would be equally available after the amendment, and (2) whether the defendant's evidence would be equally applicable after, as well as before, the amendment." *State v. Messa*, 914 S.W.2d 53, 54–55 (Mo.App. W.D.1996). The burden is on Defendant to demonstrate that he was prejudiced by the trial court's allowance of the amendment. *State v. Ruth*, 830 S.W.2d 24, 26 (Mo.App. S.D.1992).

■ The general rule is that time is not of the essence in sexual abuse cases. *Sloan*, 912 S.W.2d at 599; *State v. Ellis*, 820 S.W.2d 699, 701 (Mo.App. E.D.1991). In fact, in such cases the prosecution is not limited to presenting evidence of sexual abuse on the date alleged in the information and is free to prove that the offense occurred at any time prior to the date of indictment that is within the applicable period of limitation. *State v. Sexton*, 929 S.W.2d 909, 917 (Mo.App. W.D.1996); *State v. Mills*, 872 S.W.2d 875, 878 (Mo. App. S.D.1994). As the dates alleged in the Second Amended Information (April 1, 2002, through July 5, 2002) were prior to Defendant's indictment and were within the statute of limitation for first-degree statutory sodomy (under section 556.037, such claims must be brought within ten years of the date the victim turns eighteen), Defendant was not charged with an additional or different offense as a result of the amendment.

Defendant's claim, therefore, turns on whether he was prejudiced by the amendment. In order to prove prejudice, Defendant must demonstrate either: 1) the de-

fense he had planned to use before the charge was amended was unavailable afterward; or 2) the evidence he had planned to present before the amendment was no longer applicable after it. *Messa*, 914 S.W.2d at 54–55. Although Defendant presents a relatively detailed argument as to how the amendment charged him with a different offense, he fails to elaborate on his conclusory assertion that he was prejudiced by the trial court's decision. Defendant merely states he "was clearly prejudiced as he had prepared for trial with defenses contemplated to address the limitation in time as stated in two ... separate Informations filed by the State."

Our review of the record reveals that Defendant's defense was that the sexual abuse never occurred at all; not that it had occurred only after a particular date. That defense was equally available to Defendant before and after the trial court allowed the amendment.

Defendant also fails to identify any evidence that was no longer available to him as a result of the amendment. The evidence the State intended to present was that sexual abuse was occurring in the spring of 2002, and Defendant acknowledged as much in his opening statement.[9] As Defendant knew prior to trial that the allegations against him would include incidents alleged to have occurred in the spring of 2002, the dates set forth in both the original and first amended informations appear to be nothing more than a persistent typographical error. Defendant came to trial prepared to defend against accusations that he committed acts constituting statutory sodomy during the spring of 2002. As Defendant suffered no prejudice as a result of the amendment to the information, his third point is denied.

---

**9.** During his opening statement, Defendant's counsel said: "Ladies and gentleman, the al-

legations seem to arise in the spring and summer of 2002."

## Issue Four: Delivery of State's Exhibit 7 to the Jury

 In his fourth claim, Defendant contends the trial court erred when it sent State's Exhibit 7—an authenticated copy of Defendant's 1997 Utah conviction for child abuse—to the jury during its deliberations. Specifically, Defendant argues the exhibit was improperly given to the jury because it had been admitted during a hearing held prior to trial for the limited purpose of determining whether Defendant qualified as a "prior offender" under section 558.021. Defendant claims delivering it to the jury served only to "improperly prejudice[ ] and inflame[ ] the jury."

Section 558.021 sets forth the procedural requirements necessary for the State to establish that a defendant is a prior, persistent, or dangerous offender. To meet those requirements:

> First, the state must exhibit in its indictment or information 'facts warranting a finding that the defendant is a prior offender, persistent offender or dangerous offender....' Section 558.021.1(1). Next, the state must introduce evidence that proves beyond a reasonable doubt that the defendant fits into one of those three categories. Section 558.021.2 requires that when the state charges a defendant as a prior, persistent or dangerous offender in a jury trial, the relevant facts 'shall be pleaded, established and found prior to submission to the jury outside of their hearing....'

*State v. Greer*, 783 S.W.2d 527, 530 (Mo. App. W.D.1990). Defendant's complaint here deals not with whether Defendant should have been eligible for an extended sentence as a prior offender, but rather with the effect he alleges it had on the guilt phase of his trial. We must therefore determine if Exhibit 7 was properly before the jury as it deliberated Defendant's guilt

and, if not, what prejudice, if any, occurred as a result of the error.

Once again, Defendant fails to set forth the appropriate standard of review. Though Defendant cursorily mentions "plain error" in his point relied on, Defendant objected to the production of Exhibit 7 both during trial and in his motion for new trial.

 In general, once "an exhibit has been properly admitted into evidence, it is within the sound discretion of the trial court whether the exhibit will be sent to the jury during deliberations" and we will overturn the lower court's decision only if we determine that the trial court abused that discretion. *State v. Skillicorn*, 944 S.W.2d 877, 896 (Mo. banc 1997) (citing *State v. Graham*, 641 S.W.2d 102, 108 (Mo. banc 1982)). Such an abuse of discretion only occurs when the decision to exclude or allow an exhibit into the jury room for deliberations "was clearly against reason and resulted in an injustice to defendant." *State v. Roberts*, 948 S.W.2d 577, 596–97 (Mo. banc 1997).

In this case, however, the document establishing Defendant's prior conviction should have been offered and received into evidence only for the limited purpose of establishing whether Defendant, if convicted, would be subject to the enhanced sentencing ranges that apply to persons found to be prior offenders. Section 558.019(2).

The jury in this case had not seen or even heard about State's Exhibit 7 as it was never referred to in their presence; it was not, and could not have been, a part of the State's evidence against Defendant on the statutory sodomy charge. The purpose of the statute's express mandate that the hearing regarding a defendant's status as a prior, persistent, or dangerous offender take place outside the hearing of the jury is to keep the improper mention of a defendant's prior convictions away from

the jury. *Hurse v. State*, 527 S.W.2d 34, 35 (Mo.App. E.D.1975). Although a defendant's prior convictions can be revealed to the jury under certain circumstances—one of which is of particular importance in this case—the danger always exists that the jury will use the information not for the limited purpose for which it was received, but to convict the defendant of the current charge based on a belief that he or she is a person of bad character who has a general propensity to commit criminal acts. *See State v. McCoy*, 175 S.W.3d 161, 164 (Mo. App. E.D.2005).

One of the most common circumstances under which a defendant's prior convictions become admissible is when the defendant chooses to testify. A defendant's prior convictions can be used to impeach his or her own testimony, just as for any other witness. Section 491.050; *State v. Gregory*, 42 S.W.3d 766, 768–69 (Mo.App. W.D.2001). Proof of prior convictions can be admitted for purposes of impeachment "either by the record *or* by his own cross-examination." Section 491.050 (emphasis added). Thus, if a defendant is asked on cross-examination about his or her prior convictions and answers truthfully, the defendant has been successfully impeached by those answers given at trial and the State is precluded from admitting the physical record of the conviction(s). *State v. Sovern*, 225 Mo. 580, 125 S.W. 769, 773 (1910). Only when a defendant denies a prior conviction or gives an equivocal answer can the State then offer into evidence the written record of that conviction. *Id.*

In the case at bar, Defendant testified truthfully when asked about his prior Utah conviction. As a result, the State did not seek to admit at trial the authenticated copy of the conviction it had previously proffered to the trial court during the pretrial hearing on Defendant's prior offender status. Therefore, State's Exhibit 7 was not received into evidence during the part of the trial used to determine defendant's guilt and should not have been given to the jury.

Although sending State's Exhibit 7 to the jury was erroneous, the error does not require a reversal in this case because Defendant was not prejudiced by the fact that the jury was given access to the document. Defendant testified as to the nature and details of his prior conviction. The only information State's Exhibit 7 contained that was not previously known to the jury were a few details concerning Defendant's probation; namely, the fact that he was ordered to attend an anger management class, write the victim an apology letter, and perform community service. Defendant's own testimony about his prior conviction thus negated any potential bias. *See State v. Marlin*, 177 S.W.2d 485, 488 (Mo.1944) (improperly admitted criminal record did not prejudice defendant because he testified regarding his prior convictions); *see also State v. Kimbrough*, 350 Mo. 609, 166 S.W.2d 1077, 1079 (1942). Moreover, the trial court specifically instructed the jury that it could only consider Defendant's prior conviction for the limited purpose of determining his credibility. Defendant offers nothing to indicate the jury was unable to follow that instruction, nor anything to substantiate his claim that the exhibit "improperly prejudiced and inflamed the jury." Point four is denied.

### Issue Five: The State's Closing Argument

In his fifth point, Defendant claims that the trial court erred in overruling his objections to two statements made by the State during its closing argument. First, Defendant argues the State misstated the testimony of Victim's boyfriend when it

argued that Victim "had two sexual partners prior to her diagnosis of genital warts and condyloma. One of them doesn't have genital warts and never has." Second, Defendant argues the State misstated Defendant's opening statement when it said, "I want you to remember opening statements. I want you to remember what [Defendant] said. He said the only thing we can say about what [Victim] has to say on this witness stand is that she's lying." Defendant asserts that neither statement is supported by the record and served only to inflame the jury.

Although Defendant again seems to request only plain error review in his point relied on, Defendant objected to these arguments both at trial and in his motion for new trial.

■ A trial court has broad discretion in controlling the scope of closing argument. *State v. Storey*, 40 S.W.3d 898, 910 (Mo. banc 2001). Reversal is only warranted on properly preserved claims of error if such an abuse of that discretion occurred that a defendant was definitively prejudiced by the decision, i.e., the statement of which a defendant complains must have a "decisive effect on the jury's determination." *Id.* "There must be a reasonable probability that the verdict would have been different had the error not been committed." *Id.*

■ Both parties are entitled to wide latitude during closing arguments. *State v. Martin*, 852 S.W.2d 844, 853 (Mo. App. W.D.1992). Although "[a] prosecutor may not argue facts outside the record," *State v. Storey*, 901 S.W.2d 886, 900 (Mo. banc 1995), he or she may argue reasonable inferences from the evidence presented at trial. *State v. Vanlue*, 216 S.W.3d 729, 734 (Mo.App. S.D.2007). Moreover, even if an argument is deemed improper, such an argument only constitutes reversible error if there is a reasonable probabil-

ity that the verdict would have been different without it. *State v. Martin*, 103 S.W.3d 255, 264 (Mo.App. W.D.2003). In general, this Court will defer to the trial court's determination as to the prejudicial nature of a prosecutor's statements. *State v. Harris*, 824 S.W.2d 111, 115 (Mo.App. E.D.1992).

Both statements challenged by Defendant are supported by the record; either directly or by reasonable inference. During his direct examination, Boyfriend testified that he does not have genital warts and has never had them. While he admitted on cross-examination that he has never actually been tested for the disease, the State's reference was to his specific testimony given on direct examination. Such an action is permissible during closing argument. *Vanlue*, 216 S.W.3d at 734. In addition, the State's concession moments later that Boyfriend had not been tested for genital warts-in conjunction with the trial court's instruction to the jury to remember the evidence as it was presented-negated any potential prejudice.

■ Likewise, the State's comment that Defendant accused Victim of lying during his opening statement is also supported by the record. During his opening statement, Defendant asserted that Victim made "false accusation[s]" against him as a result of her mother's bitter divorce from Defendant. Accusing someone of making "false accusations" may fall somewhat more lightly on the ears, but it remains a simple euphemism for lying.

As both of the challenged statements are supported by the record, and Defendant fails to cite any support for his bare allegation that prejudice resulted, Defendant's fifth point is denied.

## Issue Six: Sufficiency of the Evidence

■ In his sixth and final point, Defendant contends there was insufficient evi-

914

dence to support the jury's verdict and, therefore, the trial court erred in overruling his motions for a judgment of acquittal.

Defendant's argument on this point consists of two sentences:

[t]he decision of the trial court to deny Appellant's Motion for Acquittal was in error as there was insufficient evidence to support the finding of guilt beyond a reasonable doubt. Appellate review in a challenge for sufficiency of the evidence 'is limited to a determination of whether there is sufficient evidence from which a reasonable finder of fact might have found the defendant guilty beyond a reasonable doubt'. *State v. Paulson,* 220 S.W.3d 828, 832 (Mo.App. S.D.2007) (internal citations omitted).

Defendant offers no analysis whatsoever of what essential evidence might be missing from this particular case or what necessary element or elements the State failed to prove. As we have previously noted, the requirements of Rule 84.04 are mandatory, *Hill,* 247 S.W.3d at 44, and "it is not the responsibility of the court to seine the argument portion of a brief or transcript on appeal to ascertain the whereins and whys of claimed errors." *Burks v. Beebe,* 578 S.W.2d 298, 299 (Mo. App. W.D.1979) (citing *Griffith v. State,* 504 S.W.2d 324, 327 (Mo.App. S.D.1974)).

Even if this Court were to grant an *ex gratia* review of Defendant's claim (insufficiency of the evidence being somewhat self-explanatory), Defendant would still have been entitled to no relief. When reviewing a claim that the evidence was insufficient to support the verdict, we must accept as true all evidence favorable to the verdict, including all reasonable favorable inferences that may be drawn therefrom, and we must disregard all contrary evidence and inferences. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993). We must also defer to the trial court when it comes to witness credibility, *State v. Mar-*

*low,* 888 S.W.2d 417, 421 (Mo.App. W.D. 1994), and it is outside our province to weigh the evidence ourselves. *State v. Villa-Perez,* 835 S.W.2d 897, 900 (Mo. banc 1992). Ultimately, as Defendant correctly points out, our decision is limited to whether there is substantial evidence from which a reasonable jury could possibly have found the defendant guilty beyond a reasonable doubt. *State v. Silvey,* 894 S.W.2d 662, 673 (Mo. banc 1995).

The crime of first-degree statutory sodomy occurs when a person "has deviate sexual intercourse with another person who is less than fourteen years old." Section 566.062.1. "Deviate sexual intercourse" includes "any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person ... done for the purpose of arousing or gratifying the sexual desire of any person." Section 566.010(1), RSMo Cum.Supp. 2000. In the instant case, the testimony of Victim—which we must accept as true—provided more than ample evidence to prove the above elements. Defendant's final point is dismissed and the judgment of the trial court is affirmed.

BARNEY, P.J. and RAHMEYER, J., Concurs.