STATE of Missouri, Plaintiff–
Respondent,

v.

Luther Dwayne MARTIN,
Defendant–Appellant.

No. SD 28109.

Missouri Court of Appeals,
Southern District,
Division Two.

June 26, 2009.

Stuart P. Huffman, of Springfield, MO, for Appellant.

Chris Koster, Attorney General, and Karen L. Kramer, Assistant Attorney General, of Jefferson City, MO, for Respondent.

DON E. BURRELL, Presiding Judge.

Luther Dwayne Martin ("Defendant") was convicted, following a jury trial, of two counts of murder in the first degree. *See* Section 565.020.[1] Count I charged Defendant with the death of Jerae Nicole James ("Victim"). Count II charged Defendant with the death of Victim's unborn child.[2] The jury recommended a sentence of life imprisonment without the possibility of parole on each count, and the trial court sentenced Defendant accordingly. Defendant asserts ten points of alleged trial court error, challenging, *inter alia*, the selection and composition of the jury, the admission of certain evidence, and the sufficiency of the evidence to support his convictions. Finding several points so deficient as to prevent their review and those remaining to lack merit, we affirm the convictions.

## I. Facts

Viewed in the light most favorable to the State, *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001), the facts are as follows. Victim, a seventeen-year-old, traveled with her family and a friend to Mountain Grove to visit her grandparents. Around 6:00 or 6:30 p.m. on October 7, 2001, Victim left the rest of her family to take her friend home and sell some illegal drugs. When Victim failed to return to her family in Mountain Grove when expected, her mother called Victim's cell phone several times but got no answer. After unsuccessfully searching for her daughter for several hours, Victim's mother called the police and reported her missing.

A couple of days later, Pulaski County deputy sheriff Bill Anderson ("Deputy Anderson") saw a car in a field. The vehicle appeared to have what he thought was soot on the rear passenger door, and he decided to stop and investigate. When Deputy Anderson approached the vehicle, he saw that the windows had been darkened by smoke and it was obvious to him that there had been a fire inside. Deputy Anderson ran the license plate and discovered that the vehicle was owned by a person later determined to be Victim's grandfather. Deputy Anderson then opened the car door and observed the following: 1) the driver's seat was almost completely burned, and the front passenger seat was also damaged; 2) partially burned, rolled-up paper stuck in the console between the front seats; 3) a bottle of power steering fluid and a can of charcoal lighter fluid; 4) a partially burned, size four, right-hand, military-issue, black leather glove with the name "Richadson" written inside; 5) Victim's driver's license; and 6) one of Defendant's phone bills in the back seat.

Deputy Anderson also noticed that while the car's gas cap was still on, the filler door to the tank was open. Checking under the hood, Deputy Anderson saw that someone had removed the oil fill cap and a partially burned piece of paper was stuck inside it. Deputy Anderson also located Victim's cell phone on the ground behind the car's trunk. A check of its log revealed that a 9–1–1 call had been placed from it on October 7th at 8:47 p.m. In all, it appeared to Deputy Anderson that there had been attempts to start a fire in multiple areas of the car, including the engine

1. Unless otherwise indicated, all citations to statutes are to RSMo 2000 and all references to rules are to Missouri Court Rules (2008).

2. Victim was approximately seven months pregnant at the time of her death.

compartment. Thinking what he had discovered was a stolen car, Deputy Anderson called the Waynesville police department. Officers from several different jurisdictions then arrived on the scene. One of them ran Victim's driver's license and discovered that she had been reported missing.

The gravel roads in the area around the field where the car had been located were very dusty. The officer who ran Victim's driver's license noticed that the car was also very dusty, except for a spot in the center of its trunk where it looked like the dust had been disturbed when the trunk had been pushed down by a hand. The officers could not locate any keys to the vehicle but initially gained access to its trunk by folding down the back seat. Inside the trunk was a body. After locating an electronic trunk release inside the car's glove box, the officers opened the trunk lid and saw that the person inside (later identified as Victim) was bound with duct tape around her hands and ankles, gagged, and in a fetal position. The sweatpants Victim was wearing were burned away on her upper right thigh, and a burn injury could be seen on the back of that thigh.

Because his phone bill had been found inside Victim's car, Defendant was asked to come to the St. Roberts' police department to answer some questions. After being advised of his *Miranda*[3] rights, Defendant agreed to talk with a highway patrol sergeant. Defendant told the sergeant that he had no idea why his phone bill was in Victim's car as he had never met or seen her before. A couple of days later, Defendant gave officers consent to search his vehicle and his barracks. The following items were located during the search of Defendant's vehicle: 1) a black leather, size four, military-issue, left-handed glove with the name "Richardson" written inside; 2) two standards manuals from the Fifth Engineer Battalion—one intact and one (with Defendant's name on it) missing pages eighteen through twenty-five; 3) a pair of sweatpants with a dark substance on them that appeared to be the product of a fire; and 4) inside the car's trunk, pages eighteen and nineteen from the incomplete standards manual, twisted length-wise. Defendant's fingerprints were taken, and one matched a print that was lifted from just above the lock on the trunk of Victim's car.

An autopsy revealed the cause of Victim's death to be asphyxia from carbon monoxide poisoning due to smoke inhalation. Victim's asphyxia also caused the death of her unborn child. There were large amounts of black, sooty material in Victim's larynx, indicating that she was alive when the fire was burning. No illegal drugs were in Victim's system at the time of her death, but a three-quarter-inch baggie containing white-yellow powder was found inside the sock on her right ankle. Other relevant facts will be discussed in the context of the points to which they relate.

## II. Discussion

Defendant raises ten points on appeal, claiming the trial court erred by: 1) denying his *Batson*[4] challenge to the State's peremptory strike of a black venireperson; 2) failing to strike three members of the panel for cause based on what he claims was a demonstrated predisposition in favor of the death penalty; 3) denying his motion for judgment of acquittal at the close of the State's evidence; 4) denying his motion for judgment of acquittal at the close of all the evidence; 5) refusing to

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** *Batson v. Kentucky*, 476 U.S. 79, 90, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

admit into evidence a taped interview of an individual questioned during the investigation of Victim's murder who stated therein that he had heard another individual claim to be the person who had killed Victim; 6) allowing a medical examiner and fingerprint expert to testify about other experts' reports; 7) failing to grant his motion to dismiss the case or take other remedial action based on the destruction or loss of a witness statement in violation of *Brady v. Maryland;*[5] 8) denying his motion to suppress evidence seized from his car; 9) denying his motion *in limine* to prevent officers from testifying that the sweatpants seized from his car had "soot" on them; and 10) overruling his objections to a jury instruction based on MAI–CR3d 300.03.

Points III and IV claim the evidence adduced at trial was insufficient to support Defendant's convictions. We will first address those two points together, then review the balance in the order presented.

### Sufficiency of the Evidence

 Defendant's fourth point contends the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence.[6] Specifically, Defendant argues the State's evidence was insufficient to prove Defendant: 1) acted after deliberation; and 2) was present when the murder took place.

When reviewing a challenge to the sufficiency of the evidence, we must determine whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt. *Whalen,* 49 S.W.3d at 184. We accept as true all evidence (and the reasonable inferences therefrom) that tend to prove guilt and ignore all contrary evidence and inferences. *State v. Gray,* 230 S.W.3d 613, 615 (Mo.App. S.D.2007) (internal citations omitted).

> This standard applies even when all evidence of a defendant's guilt is circumstantial. "Great deference is given to the trier of fact, and an appellate court is not to act as a 'super juror' with veto power over a verdict." Therefore, we do not weigh the evidence or determine the reliability or credibility of witnesses.

*State v. Mitchell,* 203 S.W.3d 246, 249 (Mo.App. S.D.2006) (quoting *State v. Daniels,* 179 S.W.3d 273, 285 (Mo.App. W.D. 2005)) (all other internal citations omitted).

 The crime of murder in the first degree as set forth in section 565.020 is committed if the defendant: "[1] knowingly [2] causes the death of another person [3] after deliberation upon the matter." Section 565.020(1). Here, the evidence was unclear as to whether Defendant acted alone or with others. As a result, the court's verdict director[7] ascribed "the ele-

---

**5.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**6.** Defendant's third point claims the trial court erred in denying his motion for judgment of acquittal at the close of the State's evidence. However, "[b]ecause [Defendant] presented evidence [on] his own behalf after the State rested, [he] waived any claim of error related to the denial of his motion at the close of the State's case." *State v. Tanner,* 220 S.W.3d 880, 886 (Mo.App. S.D.2007) (quoting *State v. Purlee,* 839 S.W.2d 584, 587 (Mo. banc 1992)). As the allegation of error raised in Point III was waived, it is denied.

**7.** "As to Count 1, if you find and believe from the evidence beyond a reasonable doubt: First, that on or about or between October 7, 2001, and October 9, 2001, in the County of Pulaski, State of Missouri, the defendant or others caused the death of [Victim] by suffocating her by setting fire to her vehicle, and Second, that defendant or the others knew or were aware that their conduct was causing or was practically certain to cause the death of [Victim], and Third, that defendant or the others did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are

ments of the offense to the defendant or the other person or persons." *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989) ("[I]f the evidence is unclear as to which person committed the acts the disjunctive use is proper since the jury could find that either person committed the act. The purpose of the disjunctive instruction is to give the jury the opportunity to consider evidence that is unclear.") (internal citations omitted).

To convict a defendant of first degree murder on a theory of accomplice liability, the state must prove that the accomplice deliberated upon the murder; the element of deliberation cannot be imputed. Deliberation means cool reflection upon the victim's death for some amount of time, no matter how short. A submissible case of accomplice liability for first degree murder exists where there is some evidence that the accomplice made a decision to kill the victim prior to the murder from which the jury could infer that the accomplice coolly deliberated on the victim's death.

Ordinarily, deliberation must be proved through evidence of circumstances surrounding the killing. For accomplice liability, circumstances that can support an inference of deliberation must be those properly attributable to the accomplice.

*State v. Rousan*, 961 S.W.2d 831, 841 (Mo. banc 1998) (internal citations omitted). "Where the defendant commits a murder which, because of the particular method of attack, required some time to complete, this Court has permitted an inference of deliberation." *State v. O'Brien*, 857 S.W.2d 212, 219 (Mo. banc 1993).

■ First, in regard to Defendant's contention that the State failed to prove he was present when the murder took place, being present at the time of the murder is not an element of murder in the first degree. Section 565.020; *see also State v. Holmquest*, 243 S.W.3d 444, 448 (Mo.App. W.D.2007) ("[O]ne does not have to be present at the time of the actual crime to be guilty of unlawfully encouraging the crime.").

In any event, sufficient circumstantial evidence was presented to allow a reasonable juror to find that Defendant was present during the murder. Defendant's fingerprint was found on the trunk of Victim's car. Further, Defendant's phone bill, pages twenty through twenty-five of a military standards manual entitled "Fighting Fifth Standards Manual," lighter fluid, and a military issued, size four, right-hand, black, leather glove with the name "Richadson" handwritten inside were all found in Victim's car.

Inside Defendant's car, the following items were found: a "Fighting Fifth Standards Manual" missing pages twenty through twenty-five with Defendant's name on the cover; pages eighteen and nineteen of that manual removed and twisted together lengthwise; a military-issue, size four, left-hand, black leather glove with the name "Richardson" handwritten inside; and sweatpants that appeared to be soiled with "soot." There was also evidence that Defendant bor-

---

instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt: Fourth, that with the purpose of promoting or furthering the death of [Victim], the defendant aided or encouraged the other persons in causing the death of [Victim] and did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief. Then you will find the defendant guilty under Count I of murder in the first degree. However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense."

rowed lighter fluid from a friend a few days before Victim's body was found.

As to the element of deliberation, Victim's body was found in the trunk of her car with duct tape around her ankles and her hands taped to her face; her car had eventually been set on fire after several failed attempts; Victim and her unborn child died as result of "asphyxia due to carbon monoxide poisoning by the inhalation of smoke"; and Victim was alive during the fire before dying from asphyxia anywhere from a couple of minutes to fifteen or twenty minutes. *See State v. Beishline,* 926 S.W.2d 501, 511 (Mo.App. W.D.1996) (noting that the jury could have inferred deliberation from the length of time required to produce death by suffocation or from the length of time it took to prepare a chloroform-soaked rag).

The jury could have inferred from the presence of Defendant's fingerprint on the trunk that he was the person who bound and placed Victim in the trunk of her car. It could have inferred that the lighter fluid found in Victim's car was the lighter fluid Defendant had borrowed a few days before Victim's body was discovered. The jury could also have inferred that the crime was planned in advance from the presence of the standards manual (used to start the fire) and the gloves found in Victim's and Defendant's cars. *See State v. Grubbs,* 724 S.W.2d 494, 498 (Mo. banc 1987) (holding that a jury could reasonably infer defendant and his brother engaged in victim's murder with deliberation where victim's hands and feet were bound, expert testimony was that victim's injuries were inflicted when he was alive, defendant's gloves were discarded in victim's trailer, and defendant and his brother burned the trailer in an attempt to conceal the evidence). Proof that Defendant was present at the scene was not required, and there was ample circumstantial evidence to support the necessary element of prior deliberation. Point IV is denied.

### Batson Challenge

■ In Point I, Defendant contends the trial court abused its discretion in overruling his *Batson* challenge to the prosecutor's strike of venireperson number twenty-four (# 24) because the prosecutor's explanation for the strike was not based on facts in the record and was pretextual as demonstrated by the State's failure to strike similarly situated white venirepersons.

■ Under *Batson,* counsel is prohibited from using peremptory challenges to exclude jurors on the basis of race. 476 U.S. at 89, 106 S.Ct. 1712. Our review of the denial of a *Batson* challenge is limited to a determination of whether the trial court's finding was clearly erroneous. *State v. Thurman,* 887 S.W.2d 411, 412 (Mo.App. W.D.1994). In other words, we must have a definite and firm conviction that a mistake has been made. *Id.* Because the trial court's decision relies heavily on credibility determinations, we give the trial court's findings great deference. *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987).

■ In deciding which venirepersons to strike with peremptory challenges, counsel makes a subjective determination based upon a wide variety of character and personality traits, including "hunches." *Id.* at 67. Observations made, past experiences, and common sense may form a legitimate basis for exercising a peremptory strike. *State v. Weaver,* 912 S.W.2d 499, 509–10 (Mo. banc 1995). Counsel is "not prohibited from using information outside the record as a basis for a peremptory strike." *State v. Deck,* 994 S.W.2d 527, 538 (Mo. banc 1999). So long as counsel's explanation is race-neutral (meaning a discriminatory intent is not inherent in the

explanation given), reasonably specific and clear, and related to the particular case at hand, counsel's explanation will be sufficient. *State v. Shurn*, 866 S.W.2d 447, 456 (Mo. banc 1993). "A legitimate reason is not one that makes sense but one that does not deny equal protection." *Weaver*, 912 S.W.2d at 509. "[T]he arrest, prosecution, or incarceration of a relative is a race-neutral reason for exercising a peremptory challenge." *State v. Johnson*, 930 S.W.2d 456, 461–62 (Mo.App. W.D.1996).

The trial judge is obligated to apply a three-pronged analysis in assessing the explanations provided by the prosecutor. Trial judges must evaluate the susceptibility of the particular case to racial discrimination, the prosecutor's demeanor and, finally, the judge must evaluate the explanation itself. Crucial to the analysis is whether similarly situated white venirepersons escaped the state's challenge.

*Weaver*, 912 S.W.2d at 509 (internal citations omitted).

Once the State offers its race-neutral explanation, the burden of production shifts back to the defendant to show that the proffered race-neutral explanation is pretextual and that the strikes were racially motivated. In order to meet this standard, defense counsel must present evidence or specific analysis showing that the State's explanation is pretextual. Defense counsel cannot simply rely on conclusory allegations that the real motivation for the strike was racial in nature.

*Johnson*, 930 S.W.2d at 460. "[T]he State's failure to use its strikes against venirepersons of a racial minority and the presence of a racial minority on the defendant's jury are both relevant factors for consideration to the extent they indicate

that race was not the prosecutor's motive for the challenged strikes." *Thurman*, 887 S.W.2d at 412.

Here, three members of the panel were black. From this panel, twelve jurors and four alternates were to be selected. Defendant used one of his peremptory challenges to strike a black police officer. The State's peremptory strike of # 24 then left one black person on the panel. That individual later became a member of the jury.[8] At the appropriate time in the jury selection process, Defendant challenged the State's strike of # 24 as violative of *Batson*. The prosecutor then gave the following reasons for striking # 24:

[# 24's] home address is one which is shared by an individual who we believe either to be her son or her nephew, who is currently being prosecuted by the prosecutor here in Pulaski County.

She is also one who, when the question was asked about whether—and I believe this is a question by Defense Counsel—whether she would believe the testimony of a police officer just because he was a police officer she audibly said, "Not me."

What's more, I noticed that—and I believe the Court is familiar with this— prior to its receipt in this office, her questionnaire had been substantially changed with White Out, originally indicating that she knew virtually everyone connected with this state—with this case by a check mark, those matters having then been whited out. Furthermore, there was an answer to a question that was whited out.

All that taken together gave us some considerable pause as to whether we had an individual who could fully and faithfully perform the duties of a juror and whether, in fact, she was being altogeth-

---

**8.** It is unclear from the record whether one of the alternate jurors was also black.

er forthright concerning her qualifications to serve. We therefore chose to exercise our discretion to eliminate her as a potential witness [sic] for fear that she might not have been altogether forthright with us.

Once the State offered its race-neutral explanation for why # 24 was struck, the burden shifted back to Defendant to produce evidence or a specific analysis indicating that the State's explanation was pretextual. In response to the State's explanation, defense counsel stated:

First, as to the first reason stated—that she shares a house with an individual currently being prosecuted by the prosecutor's office in Pulaski County—we had a pretrial ruling from this Court that if the State ran records on any jurors, that that information would be disclosed to Defense Counsel. That information was not disclosed to us, and I still to this point haven't seen any record that supports what [the prosecutor] says.

Furthermore, he didn't inquire her—of her about this issue and identify whether or not that would have any bearing if, in fact, she shares the house with an individual being prosecuted. There was no question asked about that so if they're claiming this was some sort of nondisclosure, the record certainly does not support that.

As to the claim by the State that when asked about police officer credibility that she said, "Not me," I can't say that I heard that. If the State heard that, they have a duty to put that on the record, identifying the person who made that remark. That remark, I'm fairly confident, is not in the record, and the State did not follow up or ask to question her about why she made that comment.

As to the whited-out marks on her questionnaire—again, the State made no effort to inquire. There were some jurors, when they checked off who they knew, who actually wrote, "No," "No," "No," instead of just leaving the little line blank, and that may've been what she did and then she re—realized that she didn't have to do that; that you only were asked to check the ones that you knew. The State, again, made no effort to inquire of her about whether, in fact, she really knew these people or if her questionnaire—if she just didn't follow the initial directions and—and then realized she'd made a mistake and tried to correct the way that she had made the corrections in the questionnaire.

In response, the prosecutor said:

To respond to that, Your Honor, your ruling required us to—if we were to access computer records, to make that—any such information available to the Defense. This was not an access of computer records. In fact, it was after the dea—death qualification of voir dire of the panel of which [# 24] was involved that [the assistant prosecutor], thinking that there was some—perhaps some identification, recognizing the name—double-checked in her office of her records in her files—files, which I might add, are-are equally available to all parties through the clerk's office—and she's the one who pointed this out to me.

It was then that I checked our copy of the questionnaire to see if there's something I might've missed, 'cause my notes did not indicate anything necessarily remiss. A close examine of the—examination of that copy, it—it—I don't know how to describe it except to say that it looked unusual, as though something might have been changed, although you can't always tell from a copy. As the Court is aware, I then asked to look at

the original, and did so. That's when I discovered that there had been massive white outs made—white outs of check marks, not the word "No," or "Yes," as to knowing these people. And I can only interpret that one way, and that is that for what—that the venire person chose to change her answer.

As to the record, I don't know whether [the court reporter] was astute enough to pick up that comment on the part of the one venire person—I'd be surprised—but it was in discussion after the fact between the three of us, trying to identify who had said that, and all three of us agreed that it was [# 24]. For me to believe that I have to follow up on that, I don't think, is appropriate—nor would I necessarily have been allowed to, consider—considering that that came up after my questioning of the vire [sic]—of the venire panel was done and under the questioning of Counsel for the Defense.

I think this is more than sufficient race-neutral reason to take this particular witness—or venire person off the panel. What's more, there are several other persons of color, if you will, who we left on this panel, which I think could only demonstrate our good will in this respect and that this is not racially motivated.

After clarifying their arguments for the record, the court found:

[T]he State's reasons were not merely pretextual; that the strikes, I don't believe, were racially motivated in this case and I—this Court's chief consideration being the plausibility of the Prosecutor's explanation in view of the totality of the facts and circumstances surrounding the issues in this matter. So I do make that finding at this time. I also note there—there was not a—a tremendous number of—of black people—or

people of color, as we would call it—on this panel to choose from, but there has been one strike, and that's the only strike that I see in term—or that I know of by the State, in any event, that was—that even had the plausibility of being racially motivated.

Defendant's argument that the State's proffered reasons were pretextual because some of them were based on information not contained in the record is misplaced. A prosecutor is permitted to use information outside the record, and a relative's prosecution is a race-neutral reason for exercising a peremptory challenge. *Deck*, 994 S.W.2d at 538; *Johnson*, 930 S.W.2d at 461–62. Further, Defendant's speculations given in response to the State's other proffered reasons were devoid of any factual support. Defendant's contention in his brief that there were similarly situated white venirepersons who were not struck is not supported by the record. The fact that the State did not use peremptory strikes to remove other black venirepersons and the fact that a member of a racial minority served on the jury provides additional support that race was not the reason for the prosecutor's strike of # 24. *See Thurman*, 887 S.W.2d at 412. The prosecutor provided race-neutral reasons for the strike, and the trial court was in the best position to determine their validity. Defendant failed to produce any evidence or a specific analysis showing the State's proffered explanation for the strike was pretextual. The trial court's finding that the State's peremptory strike of # 24 was not racially motivated was not clearly erroneous. Point I is denied.

### Panelists Predisposed in Favor of the Death Penalty

In Point II, Defendant alleges the trial court erred in overruling his motion to strike for cause three prospective jurors

who had a predisposition in favor of the death penalty. While Defendant acknowledges that this challenge to his convictions is prohibited by section 494.480.4 [9] in that the challenged panelists did not actually serve on the jury,[10] he contends section 494.480.4 is unconstitutional because:

> it violates his rights to equal protection, access to the Courts, due process, fair trial, a fair and impartial jury, and effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution in Article 1, §§ 2, 10, 14 and 18(a) of the Missouri Constitution because it subjects certain criminal defendants to restrictions on their right to appeal, but does not subject civil litigants or other criminal defendants to these restrictions.

This same argument was raised in *State v. Gill,* 167 S.W.3d 184, 194 (Mo. banc 2005). In *Gill,* the defendant argued section 494.480.4 was unconstitutional because it denied access to the courts and violated the equal protection clause "because its restrictions on challenging a trial court's denial of strikes for cause do not apply to civil litigants." 167 S.W.3d at 194–95. In rejecting the defendant's contentions, our Supreme Court stated that "the right to a panel of qualified jurors from which to make peremptory challenges is founded on statute and is not constitutional in nature" and therefore "the legislature did not impermissibly deny 'access to the Missouri courts of justice' by enacting this section." *Id.* at 194. Further, the defendant's "assumption that civil and criminal litigants are treated differently is erroneous because civil litigants are also precluded from challenging a trial court's failure to remove a prospective juror for cause if that juror is removed by a peremptory strike and does not actually sit on the jury." *Id.* at 195. As in *Gill,* "[b]ecause the prospective juror[s] did not sit on the jury and participate in the verdict, [Defendant] is precluded from challenging the trial court's refusal to strike [the] prospective juror[s] for cause." *Id.* at 195. Point II is denied.

### Taped Interview

 In Point V, Defendant avers the trial court erred in refusing to admit a tape and transcript of a police interview of Michael Evans ("Evans"). Evans had been questioned by the police during the investigation of Victim's murder and indicated that he had overheard another individual claim to have killed Victim. During this interview, Evans stated, in relevant part:

> Well, I was walking in the door and I had overheard [Dominic Tolbert] talking, having a conversation and he was on [sic] talking to this little white girl cause I had peeked in to see who he was talking to. It was a little white, some white girl. I don't know who she is, but he was talking to her about this, somebody he had killed. Then he, uhh, she ain't know [sic] he was talking about. She thought he was lying I guess and he told her the name. Told her [Victim]. And then after that that's when he went into telling the story on how he did it and, umm, the only thing that really sticks out in my mind is that when he

9. Section 494.480.4 provides, in pertinent part: "The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant."

10. Defendant used his peremptory challenges to strike them after the trial court refused to strike them for cause.

was talking about how he struggled with her to get her in the car again, I guess, one reason is, him or his cousin wanted [sic] on rape. And that's all I remember.

At trial, defense counsel offered both the tape and transcript as proposed evidence and argued both should be admitted because Evans was now unavailable and had described in this interview a conversation wherein he heard Dominic Tolbert ("Tolbert") claim responsibility for Victim's death. The court refused to receive the evidence on the grounds that it was double hearsay. On appeal, Defendant contends Evans's statement was admissible under the due process exception to the hearsay rule.

Trial courts have broad discretion in ruling on the admission or exclusion of evidence at trial. Absent a clear abuse of discretion, we will not disturb the trial court's rulings in this area. Such abuse of discretion occurs when the trial court's evidentiary ruling is clearly against the logic of the circumstances before the court, and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful deliberate consideration. "Furthermore, in matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial."

. . . .

[T]he general rule in Missouri is that extrajudicial statements against penal interest are not admissible as an exception to the hearsay rule. Where due process requires, however, such statements will be admitted if (1) the declarant is unavailable as a witness; (2) the statements, if true, would exonerate the defendant; and (3) the statements carry substantial indicia of reliability. The

United States Supreme Court in ***Chambers*** recognized three such indicia of reliability, as have Missouri courts, namely, (1) the statement must be self-incriminatory and undeniably against self-interest; (2) the statement must be made spontaneously to a close acquaintance shortly after the crime; and (3) the statement must be corroborated by other admissible evidence. *State v. Robinson,* 90 S.W.3d 547, 550–53 (Mo.App. S.D.2002) (quoting *State v. Harrison,* 24 S.W.3d 215, 218 (Mo.App. W.D. 2000)) (all other internal citations omitted). All three prongs "must be satisfied in order for the declaration to be admitted into evidence." *State v. Jennings,* 815 S.W.2d 434, 448 (Mo.App. E.D.1991).

Evans's interview statement failed to meet these criteria for several reasons. First, the statement did not satisfy the second prong because the statement would not have exonerated Defendant. Even if Tolbert had admitted to killing Victim, it would not preclude a finding that Defendant had been acting with Tolbert as an accomplice in her murder. Second, the statement does not satisfy the third prong because it does not carry any substantial indicia of reliability. Evans's statement was not self-incriminatory (it incriminated Tolbert, not Evans), it was not made spontaneously to a close acquaintance shortly after the crime (*see State v. Hutchison,* 957 S.W.2d 757, 762 (Mo. banc 1997)), and it was not corroborated by other evidence. In addition, Tolbert's testimony at trial directly contradicted the statement Evans made during the police interview. Because the proffered statement was inadmissible hearsay, the trial court did not abuse its discretion in refusing to receive it. Point V is denied.

### *Expert Testimony*

In his sixth point, Defendant impermissibly raises two separate points of alleged

error: 1) allowing a medical examiner who did not conduct Victim's autopsy to testify about the report of the medical examiner who did conduct the autopsy; and 2) allowing one fingerprint expert, Dawn Kliethermes ("Kliethermes"), to testify about the findings and report of another fingerprint examiner, Derese Herndon of the Missouri State Highway Patrol.[11]

### A. The Medical Examiner's Testimony

██ Defendant first contends that the autopsy report was testimonial evidence under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). At trial, the court allowed Dr. Edward Adelstein ("Dr. Adelstein") to testify about the autopsy report prepared by Dr. Jay Dix ("Dr. Dix"). Defendant argues that because there was no showing that Dr. Dix was both unavailable to testify at his trial and that Defendant had had a prior opportunity to cross-examine him, Defendant's confrontation rights were violated. In support of this argument, Defendant cites

our Supreme Court's decision in *State v. March*, 216 S.W.3d 663 (Mo. banc 2007), for the proposition that a defendant's confrontation rights are violated when someone other than the author of an investigatory report testifies about its contents.

The State counters that it was not error for Dr. Adelstein to testify as to his own conclusions drawn from his review of the autopsy report, citing as support this court's decision in *State v. Haslett*, 283 S.W.3d 769, 777 (Mo.App. S.D.2009).[12] Further, the State argues Dr. Dix's autopsy report was not testimonial and this court's decision in *State v. Davidson*, 242 S.W.3d 409, 417 (Mo.App. E.D.2007) (concluding an autopsy report was testimonial), is flawed because under sections 58.720[13] and 58.725,[14] "the autopsy was required to be performed regardless of law enforcement's involvement, given that [Victim] died a violent death. The fact that ultimately [Defendant] was prosecuted does not render the autopsy 'testimonial' after the fact." Thus, the State argues that

---

11. "Structuring a point relied on so that it groups together contentions not related to a single issue violates Rule 84.04." *Martin v. Reed*, 147 S.W.3d 860, 863 (Mo.App. S.D. 2004). Nevertheless, because the allegations of error are at least logically related to one another and the respondent has raised no objection based on the point being multifarious, we will review both contentions on the merits.

12. The State's reliance on *Haslett* is misplaced for two reasons. First, in *Haslett*, the doctor who testified rendered his own conclusions and opinions as to what had caused the victim's death and related that he could not speak on behalf of the doctor who had administered the autopsy. 283 S.W.3d 769, 776–77. Second, in *Haslett*, the autopsy report itself was not offered into evidence. *Id.* at n. 7. As such, we determined that the doctor's testimony was not hearsay at all. *Id.* at 777–78. Here, Dr. Adelstein not only testified about his own conclusions, but also about the conclusions of Dr. Dix. Further, the autopsy report was admitted into evidence in the instant

case. Thus, the autopsy report was hearsay and as we noted, "both *Crawford*, 541 U.S. at 42–60, 124 S.Ct. 1354, and *Davidson*, 242 S.W.3d at 416–17, are relevant to [our] analysis" because "the Confrontation Clause is triggered." *Id.* at 778.

13. "When any person dies within a county having a medical examiner as a result of … violence by homicide, suicide, or accident … the medical examiner or his designated assistant shall take charge of the dead body and fully investigate the essential facts concerning the medical causes of death."

14. "In cases in which, in the opinion of the medical examiner, an autopsy is necessary, the autopsy shall be performed by the medical examiner if he is a pathologist or by such competent pathologist as may be authorized and employed by the medical examiner. A detailed description of the findings of the autopsy, and the conclusions drawn therefrom, shall be filed in the office of the medical examiner."

autopsy reports (unlike other types of investigative reports) are not "testimonial" and "are simply business records, which are specifically excluded from a 'testimonial' label by the *Crawford* decision."

Generally, appellate review of evidentiary rulings is limited to determining whether the trial court abused its discretion. *March*, 216 S.W.3d at 664. However, where the issue is whether a defendant's rights under the Confrontation Clause were violated, a question of law exists and we review the matter *de novo*. *Id.*

The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford,* the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53–54, 124 S.Ct. 1354. The Court held that the testimonial nature of the statement is what separated it from other hearsay not prohibited by the Confrontation Clause. *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). "The Confrontation Clause analysis thus centers on whether the particular evidence at issue is 'testimonial' in nature." *Glass v. State,* 227 S.W.3d 463, 472 (Mo. banc 2007).

Confrontation Clause violations are subject to the harmless error test found in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *United States v. Chapman,* 356 F.3d 843, 846 (8th Cir.2004). That test requires that the error be harmless beyond a reasonable doubt, meaning that there is no reasonable doubt that the error's admission failed to contribute to the jury's verdict. *Id.* *March,* 216 S.W.3d at 667.

*Crawford* did not offer a precise definition of "testimonial," but the Court did offer three "formulations of this core class of 'testimonial' statements ...:"

[1] ] "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; [2] ] "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; [and 3) ] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

541 U.S. at 51–52, 124 S.Ct. 1354 (internal citations omitted). The Court noted that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Id.* at 56, 124 S.Ct. 1354.

In *Davis,* the Supreme Court provided further guidance as to what constituted "testimonial" statements in the context of statements made during a 9–1–1 call. The Court stated:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events po-

tentially relevant to later criminal prosecution. 547 U.S. at 822, 126 S.Ct. 2266. In distinguishing this police interrogation from the one in *Crawford*, the Court relied on four criteria: 1) whether the witness was speaking about events as they were actually happening, rather than describing past events; 2) whether the witness was facing an on-going emergency; 3) whether the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn what had happened in the past; and 4) the level of formality in the interview (e.g., a series of questions in a calm setting versus frantic questions and answers). *Id.* at 827, 126 S.Ct. 2266.

Prior to *Crawford*, "Missouri law permitted one medical examiner to testify as to the results of another medical examiner's autopsy." *Glass*, 227 S.W.3d at 472; *see State v. Mahan*, 971 S.W.2d 307, 316–17 (Mo. banc 1998) (finding no abuse of discretion in admitting blood tests based upon the business records exception). In *Zink v. State*, 278 S.W.3d 170 (Mo. banc 2009), our Supreme Court acknowledged that it had not decided the issue of whether an autopsy report is "testimonial" in nature "although it has held [in *March*] that a laboratory report that identified a substance seized as cocaine base was testimonial because it was prepared for use in prosecution and, in so ruling, cited cases

pertaining to autopsy reports." *Id.* at 190 (citing *March*, 216 S.W.3d at 666–67). "In so ruling, this Court applied the 'primary purpose' standard from *Davis* . . . ." *Id.*

In *March*, the trial court admitted a crime laboratory report used to prove an element of the charged crime authored by a doctor who was not called to testify at trial because he had moved out of state. The laboratory report was admitted as a business record based on the testimony of the facility's custodian of records. 216 S.W.3d at 664. On appeal, the State argued "that the laboratory report should still be admissible under the business records exception to the hearsay rule" because the Court in *Crawford* "noted that the hearsay exceptions that existed in 1791, such as the business records exception, were by their nature not testimonial." *Id.* at 665. In dismissing the State's argument, the Court stated that "[u]nder *Crawford*, however, falling within a hearsay exception does not resolve the Confrontation Clause issue because *Crawford* divorced the hearsay exceptions from the Confrontation Clause analysis. Further, the business record exception in 1791 was a narrow one." *Id.* (citing *Thomas v. United States*, 914 A.2d 1, 13 (D.C.2006)).[15] In concluding that the laboratory report was testimonial (and therefore inadmissible), the Court stated:

> Under the definitions of "testimony" and "testimonial" in *Crawford*, as well as the

**15.** *But see United States. v. De La Cruz*, 514 F.3d 121, 133 (1st Cir.2008) ("[An autopsy] report is, we conclude, in the nature of a business record, and business records are expressly excluded from the reach of *Crawford*."); *United States v. Feliz*, 467 F.3d 227, 233 (2d Cir.2006) ("[H]olding ... that testimonial statements within the meaning of *Crawford* and *Davis* would not qualify as business records under FED. R. EVID. 803(6)."); *State v. Durio*, 7 Misc.3d 729, 794 N.Y.S.2d 863, 867 (N.Y.App.Div.2005) ("Under *Crawford* business records are specifically exempt-

ed from challenge because they are outside, the 'core testimonial statements that the Confrontation Clause plainly meant to exclude.' "); *see also, e.g., State v. Crager*, 164 Ohio App.3d 816, 844 N.E.2d 390, 398–99 (2005) (refusing to adopt a *per se* exclusion of all business records from scrutiny under *Crawford*); *March*, 216 S.W.3d at 665 n. 1, 667 n. 2 (providing a list of cases from other jurisdictions that hold business records are not testimonial under the Confrontation Clause and a list of cases that hold laboratory reports are testimonial).

"primary purpose" test in *Davis,* it is clear that the laboratory report in this case constituted a "core" testimonial statement subject to the requirements of the Confrontation Clause. The laboratory report was prepared at the request of law enforcement for [defendant's] prosecution. It was offered to prove an element of the charged crime—*i.e.,* that the substance [defendant] possessed was cocaine base. The report was a sworn and formal statement offered in lieu of testimony by the declarant. Use of sworn *ex parte* affidavits to secure criminal convictions was the principal evil at which the Confrontation Clause was directed. *Crawford,* 541 U.S. at 50, 124 S.Ct. 1354. A laboratory report, like this one, that was prepared solely for the prosecution to prove an element of the crime charged is "testimonial" because it bears all the characteristics of an *ex parte* affidavit.

*Id.* at 666. Thus, the Court concluded that the admission of the laboratory report violated defendant's rights under the Confrontation Clause. *Id.* at 667.

While our Supreme Court has not decided whether an autopsy report is "testimonial," both the eastern and western districts of our court (in *Davidson,* 242 S.W.3d 409, and *State v. Bell,* 274 S.W.3d 592 (Mo.App. W.D.2009), respectively) have faced this issue since the Court's decision in *March* and both have arguably concluded that an autopsy report is testimonial. In *Davidson,* the trial court admitted into evidence an autopsy report based on the testimony of a medical examiner who was not the examiner who had prepared it. 242 S.W.3d at 417. The court, citing *March,* 216 S.W.3d at 665, stated: "In view of *Crawford,* however, the business-records exception to the hearsay rule does not overcome the Confrontation Clause right." *Id.* at 416–17. "The key issue . . . is whether the autopsy report

qualifies as 'testimonial' under *Crawford."* *Id.* at 417. In concluding that the autopsy report "in this case" was testimonial the court stated:

> One medical examiner prepared the autopsy report at the request of law enforcement in anticipation of a murder prosecution, and the report was offered to prove the victim's cause of death. The State sought to use the report and the testimony of another medical examiner in lieu of the testimony of the medical examiner who prepared the report. When an autopsy report is prepared for purposes of criminal prosecution, as this one was, the report is testimonial. *See March,* 216 S.W.3d at 667. The court may not admit the report without the testimony of its preparer unless he or she is unavailable and the defendant had a prior opportunity for cross-examination. *Id.* Those requirements were not met here. Admission of the report and another medical examiner's testimony in lieu of the testimony of the medical examiner who prepared the report violated the defendant's Confrontation Clause rights.

*Id.* Despite finding that the defendant's Confrontation Clause rights were violated, the court held that "[b]ecause the defendant conceded that the second victim died as a result of injuries suffered when he was shot and other overwhelming evidence established the victim's cause of death, any error in the admission of the autopsy report and the medical examiner's testimony was harmless beyond a reasonable doubt." *Id.* at 418.

In *Bell,* the autopsy report itself was not offered into evidence, but the chief medical examiner—not the doctor who conducted the autopsy—reviewed the autopsy report and testified both as to her own conclusions and to the conclusions reached by the

doctor who had actually conducted the autopsy. Relying on the Eastern District's decision in *Davidson*, the court held that "[a]n autopsy report, or testimony regarding an autopsy report, cannot be admitted without testimony from the person who conducted the autopsy or prepared the report unless the defendant has had an opportunity for cross-examination." 274 S.W.3d at 595. The court stated that the chief medical examiner's "testimony, to the extent she discussed [the autopsy doctor's] opinions, was error and violated [defendant's] Confrontation Clause rights." *Id.* As in *Davidson*, however, the *Bell* court nonetheless affirmed the judgment because it found the error to be harmless. *Id.* at 596. The court found that while the chief medical examiner testified to the other doctor's opinions, she also testified to her own conclusions at trial; the conclusion reached in the autopsy report was not a contested issue; and the State did not rely solely on the chief medical examiner's testimony to support its case. *Id.*

In the instant case, the autopsy report was not included in the record on appeal, and we decline to consider whether it might be considered "testimonial" absent an awareness of its contents and the circumstances surrounding its production.[16] We are free to do so in this case because if the trial court erred in receiving the autopsy report into evidence, the error was harmless beyond a reasonable doubt.[17]

At trial, Dr. Adelstein acknowledged that he did not participate in the autopsy of Victim performed by Dr. Dix but testified that he had seen photographs from the autopsy and had read Dr. Dix's report. Defense counsel objected to Dr. Adelstein's testimony, the admission of the autopsy report itself, and to the admission of Dr. Dix's *curriculum vitae* (resume). The court overruled each of these objections.

Dr. Adelstein then testified to the general procedure used in conducting an autopsy; the results of Dr. Dix's autopsy report; and his own assumptions about the time of Victim's death. Dr. Adelstein also testified that, after reviewing the autopsy pictures, Victim "was alive when there was a fire or there was heavy smoke in the area that she was in" and concluded that Victim's "cause of death was asphyxia due to carbon monoxide poisoning by the inhalation of smoke." The State then showed Dr. Adelstein a number of photographs of Victim taken at the autopsy and had him testify as to what these pictures indicated to him, including how they supported his conclusion that Victim had been dead for over twenty-four hours when the photographs were taken. The court received the photographs into evidence over Defendant's objection.

Here, the autopsy report was used to show that Victim died of smoke inhalation. However, the means of Victim's death was not disputed at trial. Defendant's theory of the case was not that Victim had died of something other than smoke inhalation, but that he was not responsible for her death whatever its cause. Thus, as in *Davidson* and *Bell*, the conclusion reached in the autopsy report was not a disputed issue. Defendant's theory of defense was

---

16. Pursuant to Rule 81.12(a) "[t]he record on appeal shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision." Because we find that Defendant was not harmed beyond a reasonable doubt we do not deem it necessary to order a supplemental record. *See* Rule 81.12(f).

17. We do acknowledge that Dr. Adelstein's testimony as to Dr. Dix's conclusions was hearsay, but its admission was also harmless for the same reason that applies to the admission of the autopsy report.

that he was not involved in Victim's death at all. As a result, any error in the admission of the autopsy report and Dr. Adelstein's testimony about its contents was harmless beyond a reasonable doubt. *Davidson*, 242 S.W.3d at 418; *Bell*, 274 S.W.3d at 596.

The portions of Dr. Dix's testimony at issue were also harmless because they were cumulative of other admissible evidence. Dr. Christopher Long, a forensic toxicologist, testified that Victim's toxicology report revealed fatal amounts of carbon monoxide in her body. "When evidence challenged on constitutional grounds is cumulative of other properly-admitted evidence, the disputed evidence could not have contributed to the defendant's conviction and is harmless beyond a reasonable doubt." *Zink*, 278 S.W.3d at 189 n. 11 (quoting *State v. Lopez*, 128 S.W.3d 195, 202 (Mo.App. S.D.2004)); *see also Davidson*, 242 S.W.3d at 418; *Bell*, 274 S.W.3d at 596. This portion of Defendant's point is denied.

### B. The Fingerprint Expert's Testimony

Defendant's argument with regard to Kliethermes's testimony consists of one paragraph, providing, *in toto:*

> Under the same analysis as above, the Court erred in allowing Dawn Kliethermes to testify regarding the findings and report of Derese Herndon, Missouri State Highway Patrol fingerprint examiner. The Court additionally erred in allowing the State to introduce Exhibit 56, the fingerprint report prepared by Derese Herndon. Dawn Kliethermes was a fingerprint examiner for the Missouri State Highway Patrol who testified as to the findings of Ms. Herndon. To allow Ms. Klierthermes [sic] to testify as to Ms. Herndon's findings, in addition to her own, was hearsay and bolstering in

violation of *Crawford.* Defendant objected to this testimony on those grounds and was denied by the Court. The defendant also objected to the fingerprint report prepared by Ms. Herndon, as it was testimonial hearsay and violated *Crawford.* Laboratory reports prepared solely for prosecution to prove an element of the crime charged is testimonial for purposes of the Confrontation Clause and it may not be admitted without the testimony of its preparer unless the witness is unavailable and there was a prior opportunity to cross examine. *State v. March*, 216 S.W.3d 663.

At trial, Kliethermes testified that she performed laboratory tests on latent fingerprints thought to have been Defendant's; that it was common practice to have two examiners look at the results of an examination; that the normal procedure was that if someone thought they had a fingerprint match she would compare the result; that she agreed with and certified Herndon's conclusion; and that Herndon's conclusion was that the latent fingerprint found on Victim's vehicle matched Defendant's fingerprints. Defendant objected to Kliethermes testifying as to Herndon's conclusions on the grounds that it was hearsay and bolstering, but the court overruled this objection. The court also overruled Defendant's objection to the admission of Herndon's laboratory report. Defendant did not state any grounds for this second objection.

Here, Defendant's constitutional claim was not properly preserved for appellate review. "To preserve a constitutional issue for review, which does not involve the statute on which the prosecution is based, an objection must be raised at the earliest time consistent with good pleading and orderly procedure and must be kept alive during the course of the proceedings." *State v. Pieron*, 755 S.W.2d

303, 307 (Mo.App. E.D.1988). Defendant's sole objection was based on hearsay and bolstering; no constitutional objection was raised. As a result, we may review for plain error only.

Ordinarily, a properly preserved error concerning the admission of evidence is reviewed on appeal for an abuse of discretion. Unpreserved errors, however, are only reviewed for plain error, and such a review is undertaken at the Court's discretion. The burden is on the Defendant to demonstrate plain error. A Defendant must show (1) that the error was plain, i.e., evident, obvious, and clear; (2) that a failure to correct the error would produce a manifest injustice or miscarriage of justice; and (3) that the error was outcome determinative. Such a standard places a much greater burden on Defendant than that ordinarily incurred on appeal, as he must go beyond a demonstration of mere prejudice and actually establish such a misdirection of the jury as would cause the requisite level of injustice. *State v. Moore,* 252 S.W.3d 272, 275 (Mo. App. S.D.2008) (internal citations omitted).

■■■ Even if the trial court had excluded the laboratory report and Kliethermes's testimony regarding Herndon's conclusions, the outcome would have been the same. Kliethermes testified that it was her conclusion that the fingerprint from the laboratory report matched Defendant's. Thus, the complained-of evidence was cumulative of her own clearly admissible testimony and could not have contributed to Defendant's conviction. *Davidson,* 242 S.W.3d at 418. The laboratory report was not admitted to prove any element of the crime charged, and in closing argument Defendant conceded that his fingerprint was found on Victim's car. Any error in the admission of the laboratory report or Kliethermes's testimony

about it was not outcome determinative. No manifest injustice or miscarriage of justice occurred here. The remainder of Point VI is denied.

### Motion to Dismiss for Brady Violation

Defendant's Point VII provides:

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO GRANT DEFENDANT'S MOTION TO DISMISS OR TO TAKE REMEDIAL ACTION FOR DESTRUCTION OR LOSS OF WITNESS STATEMENT AND/OR RECORDINGS IN VIOLATION OF *BRADY V. MARYLAND,* WHICH PREJUDICED DEFENDANT BY NOT HAVING FULL ACCESS TO EXCULPATORY MATERIAL AND TO PRESENT A DEFENSE DENYING DEFENDANT HIS RIGHTS UNDER THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, OF ARTICLE 1, §§ 2, 10, 15, 18(A), 19, 21, AND 22(A) OF THE MISSOURI CONSTITUTION. THEREFORE, THIS COURT MUST REVERSE AND REMAND.**

■■■■ First, we note that Defendant's point is deficient under Rule 84.04(d) for failing to concisely state the legal reasons for the alleged error and because Defendant does not "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Defendant has not provided any context for his claim and there is no indication of what evidence was lost or destroyed.

"Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), due process is violated when the prosecutor suppresses evidence that is favorable to the defendant and material to either guilt or punishment." *State v. Salter,*

250 S.W.3d 705, 714 (Mo. banc 2008). "There are three components of a true *Brady* violation: [1] ] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] ] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] ] prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Anderson v. State,* 196 S.W.3d 28, 36–37 (Mo. banc 2006).

*Taylor v. State,* 262 S.W.3d 231, 240 (Mo. banc 2008).

The argument portion of Defendant's brief reveals that his contention is that the State either lost or destroyed three key pieces of evidence: 1) statements taken by the police from six suspects the night Victim's body was discovered that may have been recorded; 2) "information from a confidential informant that [Defendant's] participation in the crime may have been relatively minor and that [Victim] had been killed at a party"; and 3) "during voir dire, juror 125 . . . revealed that he had prepared aerial maps of the crime scene for the prosecution."

Defendant has not asserted how any of the allegedly lost or destroyed evidence would have been favorable to him. He does not show how any of the evidence would have exculpated him or how it was impeaching. Moreover, it is unclear from the record whether the referenced statements were ever made and whether there actually was a confidential informant.[18]

Defendant has also failed to show that any such evidence was willfully or inadvertently suppressed by the State. Lastly, Defendant has failed to assert how he was prejudiced. Because of Defendant's failure to properly set forth his actual complaint, this court cannot review his point without abandoning its role of neutrality and becoming an advocate. This we cannot do. *Richmond v. Springfield Rehab. & Healthcare,* 138 S.W.3d 151, 153 (Mo. App. S.D.2004). Point VII is denied.

### Motion to Suppress Evidence Seized from Defendant's Car

In Point VIII, Defendant contends the trial court erred by denying his motion to suppress the evidence seized from his car. Again, Defendant's point is defective for a number of reasons. First, Defendant fails to identify with particularity the evidence he claims was erroneously admitted and fails to state whether he objected to its admission at trial. *See* Rule 84.04. Second, the point only challenges the court's decision to deny the motion to suppress. "[A] point relied on attacking the trial court's ruling on a pretrial motion to suppress, without attacking the court's ruling admitting the evidence, is deficient in that it does not identify the actual ruling that is subject to challenge and, therefore, does not preserve the issue for appellate review." *State v. Lloyd,* 205 S.W.3d 893, 900 (Mo.App. S.D.2006) (quoting *State v. Wolf,* 91 S.W.3d 636, 642 (Mo.App. W.D. 2002)); *see also State v. Talley,* 258 S.W.3d 899, 907 (Mo.App. S.D.2008) (finding nothing to review where defendant's point relied on only mentioned the trial court's ruling on his motion *in limine,* although the argument section mentioned both the

---

**18.** In regard to our review of this point as it relates to the aerial map, because this particular allegation of error was not included in Defendant's motion to dismiss, it has been waived.

trial court's ruling on the motion and the overruling of his trial objection).

At trial, Defendant offered a continuing objection to the evidence seized from the search of Defendant's car, but what the basis of that objection was is not apparent from the record. In the argument section of his brief, Defendant summarily contends it was error to admit "State's Exhibits 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, [and] 53." Defendant has not provided any page references to the transcript in support of this conclusory allegation. Under Rule 30.06(e), "[a]ll statements of fact and argument contained in any brief shall have specific page references to the legal file or the transcript." *See also* Rule 84.04(i). "[T]his requirement is mandatory and essential for the effective functioning of appellate courts, which cannot spend time searching the record to determine if factual assertions are supported by the record. This would effectively require the court to act as an advocate for the non-complying party[.]" *Brown v. Shannahan*, 141 S.W.3d 77, 80 (Mo.App. E.D.2004). Point VIII is denied.

### Motion in Limine

■■■ Defendant's ninth point contends the trial court erred in overruling his motion *in limine* "to prevent officers from testifying that the sweatpants seized from [Defendant's] car had what appeared to be 'soot' on them, thereby implying that the sweatpants had been exposed to fire and such testimony was without proper foundation and was more prejudicial than probative." This point suffers from the same deficiency as Point VIII in that it contests only the trial court's pre-trial ruling on the motion *in limine*. Like a motion to suppress, a motion *in limine* is interlocutory in nature (subject to change) and the court's ruling on it is not subject to appeal. Because Defendant's point only refers to the trial court's pre-trial ruling it leaves

nothing for us to review. *Talley*, 258 S.W.3d at 907.

■■■ Even if this point had actually challenged the admission of the testimony at trial, Defendant would still not have been entitled to any relief. The police officer's trial testimony describing the soil from the stain on the sweatpants as "kind of soot," reveals that defense counsel objected to the description and the trial court *sustained* the objection. Even if the trial court had overruled the objection, we would find no error in its doing so because the officer's description—although it may contain a conclusion, opinion, or inference—accords with the ordinary experience of everyday life. "Witnesses are permitted to express conditions in terms understandable to the average person, even though the term utilized is a summary of a combination of sensory impressions or separate physical conditions." *Travelers Indem. Co. v. Woods*, 663 S.W.2d 392, 399 (Mo.App. S.D.1983), *citing Whitney v. Cent. Paper Stock Co.*, 446 S.W.2d 415, 419 (Mo.App.St.L.D.1969) (holding that testimony that wood was "rotten" should have been allowed). As this court stated in *Woods:*

> The test for allowing such is that when it is impossible or extremely difficult for a witness to convey an accurate and actual meaning, and the nature of the thing described may be more clearly and practically conveyed to the jury by a summary of the witness's impressions, or by comparison with some ordinary object or condition familiar to the court or jury, then the practical administration of justice requires acceptance of the testimony even though it may be, in a sense, the conclusion of the witness.

*Id.*

Point IX is denied.

### Jury Instruction

■■■ In his final point, Defendant asserts the trial court erred in overruling his

objections to a jury instruction based on MAI–CR3d 300.03AA. Defendant's point is replete with errors. First, Defendant has not provided any legal reasons for his claim of reversible error in violation of Rule 84.04(d). Second, Defendant has cited no authority supporting his contention. While this second problem, in itself, would not categorically stop us from reviewing the point, Defendant has also provided no explanation as to why no authority was provided. *See* Rule 84.04(d)(5); *see also Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978) ("We suggest that if the point is one for which it is believed that precedent for or against it is unavailable, counsel would be well advised to specifically so state under the point in question, explaining why citations are unavailable."). Third, Defendant has failed to identify the challenged instruction by number and did not set forth the full text of the instruction in either the argument section of his brief or include it in his appendix.[19] Finally, Defendant's argument is devoid of any references to the record. As mentioned above, all statements of fact and argument shall have specific page references to the record. Rule 30.06(e). For these reasons, this point also presents nothing for appellate review. Defendant's final point is also denied, and the judgment is affirmed.

LYNCH, C.J., and PARRISH, J., concur.

---

19. Many of the court's instructions to the jury are included in the appendix to Defendant's brief, but the one he is apparently challenging is not among them. Pursuant to Rule 84.04(e) "[i]f a point relates to the giving, refusal or modification of an instruction, such instruction shall be set forth in full in the argument portion of the brief." On the other hand, Rule 84.04(h) has recently been amended (effective July 1, 2008) and now provides: "The inclusion of any matter in an appendix does not satisfy any requirement to set out such matter in a particular section of the brief, *except that instructions set out in the appendix need not be included in the brief.*" (emphasis added)